UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Justin Andrew Bruntjen Esq.,

     Plaintiff,

v.

**Raffles Van Exel**, an Individual;

**White, Wiggins & Barnes, LLP**, a Dallas, Texas
law firm;

**Ward Allen White IV**, an Individual;

**Kennedy Lowell Barnes**, an Individual;

**James W. Tippin & Associates**, a Kansas City, Missouri
Law Firm; and

**Keith Anthony Cutler**, an individual.

     Defendants.

Case Type: Defamation
Court File No.:20-CV-01832

**COMPLAINT**

    Plaintiff, Justin A. Bruntjen, for his cause of action against the above-named Defendants,
states and alleges as follows:

### Parties

    1.  Plaintiff Justin A. Bruntjen is a duly licensed attorney and resident of Hennepin
County in the State of Minnesota.

    2.  Defendant Raffles Van Exel ("Raffles") upon information and belief is a resident of
the State of California whose address is 932 Larrabee Street, #304, West Hollywood, California,
90069.

    3.  Defendant White Wiggins & Barnes LLP ("WWB") upon information and belief is a
Law Firm duly licensed to practice in the State of Texas with a principal office address of 1700
Pacific Avenue Suite 3740 Dallas, Texas 75201.

    4.  Defendant Ward White IV. ("White") upon information and belief, is a resident of
Texas and an attorney and managing partner at WWB duly licensed to practice in the State of

Texas.

5.      Defendant Kennedy Barnes ("Barnes") upon information and belief, is a resident of Texas and an attorney and managing partner at WWB duly licensed to practice in the State of Texas.

6.      Defendant James W. Tippin & Associates ("Tippin") upon information and belief, is a Law Firm duly licensed to practice in the State of Missouri with a principal office address of 21 West Gregory Boulevard Kansas City, Missouri 64114.

7.      Defendant Keith Cutler ("Cutler") upon information and belief is a resident of Missouri and an attorney and managing partner at Tippin duly licensed to practice in the State of Missouri.

**Jurisdiction and Venue**

8.      Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over Plaintiff's claims based on the parties diversity of citizenship and because the amount in controversy is in excess of $75,000.

9.      Venue is proper because Plaintiff's contract that Defendants conspired to and did tortuously interfered with was to be performed primarily in Hennepin and Carver County, Minnesota. Further, Defendants Defamatory statements were published by an online media source with worldwide reach including Minnesota.

**Factual Background**

**A.      Raffles is introduced to Alfred Jackson, represents himself out to be a manager to celebrities, including Prince, and puts into motion a plan to financially exploit Alfred.**

10.      Raffles real name is unknown, but he is known to use other names and pseudonyms and to have impersonated others in the past.

11.      Raffles claims to be Founder / President of Raffles Entertainment as found at: https://www.linkedin.com/in/raffles-van-exel-044a5127. His business is also known as Raffleution, LLC.

2

12.     Raffles claims to have guided "some of the world's most acclaimed executives and celebrities: Actor Quinton Aaron from the smash hit The Blind Side with Sandra Bullock, Peter Lamas CEO and founder of Lamas beauty, the late King of Pop Michael Jackson, Whitney Houston, Patti LaBelle, Lance Bass (Founding member of iconic pop group, N'Sync), Flavor Flav of the iconic rap group Public Enemy and of the "Flavor of Love" fame, George Benson, and the late Ray Charles. Raffles van Exel has produced for The Queen of Salsa - the late and great Celia Cruz, funk pioneer George Clinton, Sisqo, Nick Cannon, Howie Dorough (Founding member of Grammy nominated group, The Backstreet Boys), rap icon and actor Ice-T, and a host of other artists."

13.     Raffles has a colored history involving musicians and those around them.

14.     Raffles was in the hotel room of Whitney Houston at or shortly after the moment she was found dead from a drug overdose and he removed evidence from the room prior to police arriving according to: https://www.nydailynews.com/entertainment/gossip/whitney-houston-close-friend-raffles-van-exel-admits-removing-evidence-singer-hotel-room-death-article-1.1052013

15.     Upon information and belief, Raffles supplied cocaine to Ms. Houston shortly before her death according to: https://www.nydailynews.com/entertainment/gossip/whitney-houston-close-friend-raffles-van-exel-admits-removing-evidence-singer-hotel-room-death-article-1.1052013

16.     Upon information and belief, Raffles took pictures of Whitney Houston's dead body and sold it to the media for his personal gain according to: https://www.youtube.com/watch?v=vGDn3o4ZBSo

17.     Upon information and belief, Raffles inserted himself into Michael Jackson's entourage and is believed to have benefited from Michael Jackson's death via distribution of assets and or personal property.

18.     Upon information and belief, Raffles has a history of searching out celebrities and their family when they are at a low point and then inserting himself into their lives ultimately for his own financial gain or for financial gain of those he is associated with.

19.     Raffles produced a video as seen at: https://www.youtube.com/watch?v=YSF1aPLF2sY portions of which are publicly available on YouTube, wherein he describes the art of the Hollywood con and how to get close to celebrities.

20.     Upon information and belief, Raffles believes rules and laws are made to be broken – as long as you do it elegant and that he is willing to do whatever it takes.

21.     Upon information and belief, Raffles believes that celebrities are like everyone else – the more they see you the more comfortable they will be with you.

22.     Upon information and belief, Raffles believes that in order to get into someone's circle, just be around and once you are in the circle the network starts.

23.     Raffles video captures how he fraudulently gains access into the 2003 Billboard Awards at the MGM Grand Hotel and Casino without any credentials or tickets or authorization to be there.

24.     The Raffles video catalogs a series of lies and deceit in order for Raffles to achieve his goals.

25.     Raffles stated, "always go for the kill and never take no for an answer, especially not from somebody who is not in the power or liberty to say yes."

26.     One of Raffles personal rules is to "show no shame." This equates to "lying to a blind man" to get what you want as demonstrated in his video.

27.     The life mantra and talent for being a con and playing people to advance his own purposes was in full display and effect during the time Raffles worked himself into Alfred Jackson's ("Alfred") circle.

28.     Alfred was a half-brother of the late internationally-acclaimed artist Prince, who died intestate on April 21, 2016. Alfred was one of six of Prince's siblings who had been

designated the sole heirs of the Prince Estate, for which probate proceedings in Carver County Minnesota are ongoing.

29.     Immediately following Prince's death Raffles called Alfred's brother, Bruce Jackson ("Bruce") and told him that Bruce should fly to Minnesota and take Alfred out of the long-term care facility he was living at in Waite Park.

30.     Upon information and belief, seeing Alfred as a potential "mark" to con, Raffles flew to Minneapolis to meet with him and Bruce on or around April 23, 2016.

31.     Raffles misrepresented his experience and qualifications, including that he had previously worked for Prince, to Alfred in order to get him sign a "Letter of Agreement" on April 23, 2016. As compensation in the agreement Raffles was to be paid ten percent (10%) by Alfred. *See April 23, 2016 Letter of Agreement attached hereto as Exhibit 1.*

**B.     Raffles introduces Alfred to Frank Wheaton, Raffles attorney, to represent Alfred in Prince's probate case.**

32.     On or around April 23, 2016, Raffles had his friend and attorney, Frank Wheaton ("Wheaton"), fly to Minneapolis from Los Angeles and introduced him to Alfred.

33.     On or around April 23, 2016, Alfred retained Wheaton to represent him in Prince's probate matter.

33.     Alfred then engaged Plaintiff in late April of 2016 to serve as local counsel under the direction of Wheaton, whose primary office is in California.

34.     As Alfred's attorney, Plaintiff had a contractual agreement to represent him in any and all legal matters.

**C.     Raffles and Alfred have a falling out over Raffles secretly opening up a bank account in his and Alfred's name.**

35.     For months Raffles ran his "con" on Alfred trying to find ways to benefit from Alfred's status as an heir to Prince's Estate. Raffles traveled to Kansas City to visit Alfred, attended court dates and other events in Minneapolis. Using Alfred, Raffles gained access to award shows and parties, some which he attended with Alfred. In order to further ingratiate himself

to Alfred, Raffles acted as a gopher for Alfred getting him food, drinks, medication and running other errands.

36.     Around late December 2016 early January 2017, Raffles brought Alfred to a Wells Fargo in Minneapolis and had Alfred open a bank account in both Raffle's and Alfred's name.

37.     Alfred immediately told Bruce about the bank account that Raffles had set up and as a result Alfred and his family ceased communicating with him.

38.     Raffles continued to try and maneuver his way back into Alfred's inner circle going so far as to try and trick Bruce and Alfred into showing up at a Grammy's party that Raffles was attending in February 2017.

39.     In late March 2017 Wheaton was terminated by Alfred and Plaintiff assumed the role of Alfred's primary legal counsel.

**D.     Raffles is able to work his way back into Alfred's inner circle and begins trying to get Plaintiff fired and replaced by a "Raffles friendly" Law Firm.**

40.     At some point in the beginning of 2018, for reasons not specifically known, Alfred started allowing Raffles around him again.

41.     With the experience that having other people around Alfred hindered his ability to take advantage of him, Raffles started taking calculated actions to isolate Alfred from people he trusted and replace them with people who Raffles could control or would help him benefit from Alfred.

42.     Raffles knew that Plaintiff would not agree to do anything to the detriment of Alfred so Raffles started taking actions to get Plaintiff fired and replaced with attorneys that Raffles could control and that would help him further his objective of exploiting Alfred.

43.     Starting at the end of August 2018 and continuing through August 2019, Raffles began telling Alfred and Bruce that Plaintiff was racist, "didn't like black people" and that he had stolen money from Alfred.

44.     Raffles also tried to have Alfred hire Raffle's friends so that they could try and financially exploit Alfred's position within the Prince Estate.

45.     Sometime in September 2018 Raffles had a friend of his, Jo-Ann Geffen, fly out to Kansas City to meet with Alfred. Geffen then contacted representatives for the Special Administrator of the Prince Estate, Comerica, attempting to get confidential financial information. This effort was ultimately unsuccessful because as Alfred's attorney, Plaintiff confirmed with Comerica's representatives that he had no idea who Geffen was nor of any dealings she had with Alfred.

46.     Following the failure of Geffen to get any information, Raffles became even more motivated to get Plaintiff terminated.

47.     On September 25, 2018 Raffles sent Bruce an email with an attached document he had drafted entitled "termination of employment and representation" Raffles instructed Bruce to "print this letter and let Alfred sign it. Once its signed, email it to Justin, Joseph Cassioppi, Angela Aycock, Raffles Van Exel and yourself." *See September 25, 2018 email from Raffles and Bruce with attached Termination Letter attached hereto as Exhibit 2*.

48.     After receiving this email a representative from Comerica, Angela Aycock, called Alfred and asked him if he wanted to fire Plaintiff at which time Alfred told her that he did not.

49.     Following the unsuccessful attempt to get Plaintiff terminated Raffles realized he need another attorney or law firm in place and ready to take over so they could act as a gatekeeper to the communications between Alfred and Comerica.

**E.      Raffles meets WWB and they set into motion a plan to replace Plaintiff as Alfred's attorneys.**

50.     At some point around the end of September 2018, Raffles made the acquaintance of Ward White IV and Kennedy Barnes, managing partners of White, Wiggins & Barnes LLP, a law firm based out of Dallas, Texas.

51.     Raffles worked with Barnes and White to try and get Alfred to fire Plaintiff and replace him with WWB. This included Barnes and White telling Alfred that Plaintiff stole money from him and they needed to hire WWB to get it back.

52.     In a further attempt to get Alfred to terminate Plaintiff, White and Barnes had Alfred sign an engagement letter stating that Alfred would not have to pay WWB any money for their services. The engagement letter specifically states that "WWB will submit monthly invoices to the administrator of the Prince Estate, which we understand at this time to be Comerica Bank. All payments are to be paid from the Prince Estate until the parties agree otherwise." *See October 26, 2018 Engagement Agreement between Alfred and WWB attached hereto as Exhibit 3.*

53.     In order for Raffles to benefit from their representation of Alfred, White and Barnes, put a provision in their engagement letter stating "WWB will engage the consulting services of Mr. Raffles Van Exel...Fees for Mr. Van Exel's services will be included in our invoice and billed to the Prince Estate." *See Exhibit 3.*

54.     Raffles and WWB accomplished their goal on November 2, 2018 when Plaintiff was replaced as Alfred's counsel by WWB. *See the November 2, 2018 Substitution of Counsel and Consent to Substitution of Counsel for Alfred Jackson attached hereto as Exhibit 4.*

**F.     Raffles starts working behind WWB's back to get Alfred to sign a loan agreement.**

55.     In November 2018 Michael Lythcott, ("Lythcott") an agent for Alfred was working to get Alfred to enter into a loan agreement with a company or entity, Primary Wave Music IP Fund 1, LP ("Primary Wave").

56.     Around this time Lythcott told Plaintiff that Raffles was "holding him hostage" in regards to getting the loan documents signed and demanding payment for doing so.

57.     On December 8, 2018, just over five weeks after Raffles and WWB were able to get to Alfred to terminate Plaintiff, Alfred entered into a loan agreement with Primary Wave.

58.     Upon information and belief in exchange for Alfred signing the loan documents Raffles received in excess of $70,000.

8

59.     Upon information and belief Alfred did not have the benefit of legal counsel when he entered in the loan agreement with Primary Wave.

**G.     WWB requests Alfred's file from Plaintiff and makes allegations that Plaintiff stole money from Alfred.**

60.      On December 6, 2018 Plaintiff received an email with a letter attached requesting Alfred's file. *See December 6, 2018 Letter to Plaintiff From WWB attached hereto as Exhibit 5.*

61.     Plaintiff responded that same day via email stating that he would begin working on it.

62.     At some point in December 2018, Plaintiff learned that Alfred had terminated WWB's representation on December 2, 2018. *See December 2, 2018 Termination of Employment and Representation attached hereto as Exhibit 6.*

63.     On December 14, 2018, Plaintiff received a call from Lythcott stating that he was with Bruce, Raffles and Alfred at Alfred's house in Lee's Summit, Missouri and they had been talking to White and Barnes on the phone and that White, Barnes and Raffles were telling Alfred, Lythcott and Bruce that Plaintiff had stolen $500,000 from Alfred that was due him toward the end of December 2017.

64.     White told Alfred, Lythcott and Bruce that he and Barnes had spent hours at the bank with Alfred and there was no record of Alfred receiving any of the money from Plaintiff in December 2017.

65.     Immediately upon being confronted with these allegations Plaintiff sent Lythcott confirmation that $450,000 ($500,000 minus $50,000 in fees for Plaintiff) was wired to Alfred on December 27, 2017. Upon information and belief Lythcott then forwarded the wire confirmation to White and Barnes.

66.     White and Barnes said they had copies of Alfred's bank statements, which they had extensively reviewed, proving Alfred never received the December 2017 wire from Plaintiff but they refused to let Lythcott or anyone else see them.

9

67.     During this telephone call White accused Plaintiff of being a criminal and said that White had been doing this for twenty years and he was positive Plaintiff stole the money.

68.     On December 21, 2018, Plaintiff received an email from Barnes with a letter attached stating this time that Plaintiff had "deducted $100,000 [from Alfred] from a disbursement without authority" and again asking for a copy of Alfred's file. *See December 21, 2018 Letter to Plaintiff from WWB attached hereto at Exhibit 7.*

69.     On December 23, 2018 Plaintiff sent Barnes a response to the December 21, 2018 letter stating that the allegations they [WWB] were making against Plaintiff "have been fabricated and or they have absolutely no bases in fact whatsoever". Plaintiff demanded that WWB stop spreading falsities and informed them that their comments were defamatory and easily proven false. The letter also stated that Plaintiff was aware that WWB had been terminated by Alfred on December 2, 2018 and that before Plaintiff would provide anything to WWB he needed written authorization that Alfred had rehired them and the scope of such representation.  The letter further informed Barnes that Plaintiff had contacted representatives of the Prince Estate and confirmed that they had not had any contact with anyone from WWB since the December 2, 2018 termination letter. *See December 23, 2018 Letter to Barnes from Plaintiff attached hereto as Exhibit 8.*

**H.     WWB files a lawsuit against Plaintiff claiming Plaintiff stole $500,000 from Alfred.**

70.     Plaintiff did not have any further communication with White, Barnes or WWB until January 31, 2019 when Plaintiff received an email from Barnes with a complaint attached. *See January 31, 2019 Original Complaint and Application for Modification or waiver of Expert Review On Behalf of Alfred Jackson Against Plaintiff attached hereto as Exhibit 9.*

71.     The complaint named Plaintiff as the Defendant and accused Plaintiff of stealing $500,000 from Alfred. *See Exhibit 9*

72.     The lawsuit was filed in the United States District Court for the Western District of Missouri and signed off on by Barnes and Keith Cutler of the Missouri Law Firm James W. Tippin & Associates.

73.     Upon information and belief, prior to his filing of the lawsuit, Cutler nor anyone at Tippin never spoke with Alfred nor did any due diligence to verify that WWB were given authority or even retained by Alfred to file a lawsuit on his behalf or that the allegations in the suit had any basis in fact.

74. The lawsuit specifically states "no portion of the December 22, 2017 disbursement was ever received by Alfred." *See Exhibit 9.*

75.     A simple review of Alfred's bank statements which per White and Barnes were in their possession would have shown that the allegations that Plaintiff stole any money from Alfred were completely false.

76.     Upon review of the lawsuit, Plaintiff emailed Barnes confirmation of the wire and once again demanded that Barnes and WWB cease from making false allegations against him. *See February 1, 2019 email to Barnes from Plaintiff attached hereto as Exhibit 10.*

77.     On February 1, 2019 Plaintiff received an email from Ryan Naumann, a producer at TheBlast.com, an online media source, asking for a comment regarding the "missing" $500,000. *See February 1, 2019 Email from Naumann to Plaintiff attached hereto as Exhibit 11.*

78.     Plaintiff had a telephone conversation with Barnes on February 1, 2019 in which Plaintiff told Barnes that media had already contacted him and Plaintiff demanded they dismiss the complaint.

79.     From February 2 through February 4 Plaintiff requested numerous times on the phone and through email, to get law enforcement involved because if what the lawsuit was alleging were true Plaintiff would have been guilty of a crime. Barnes and WWB repeatedly refused to involve law enforcement.

80.     On February 5, 2019 Ward, Barnes and Cutler dismissed the lawsuit and sent Plaintiff a copy of the Notice of Dismissal. *See February 5, 2019 Notice of Voluntary Dismissal Pursuant to F.R.C.P. 41 (a)(1)(A)(i) attached hereto as Exhibit 12.*

81.      On February 6, 2019 Plaintiff was sent an article by Omarr Baker, Alfred's brother. The article was published by TheBlast.com and was based around the allegation that Plaintiff stole $500,000 from Alfred. https://theblast.com/prince-brother-sues-lawyer/

82.      Upon learning about TheBlast.com article Plaintiff immediately sent Naumann an email demanding they retract the article. Plaintiff then received a response from Lonnie Grant, legal counsel at theBlast.com, refusing to take the article down.

83.      The article was subsequently picked up by additional media outlets.

**I.     Alfred hires the law firm of Chestnut & Cambrone to represent him in regards to his interests in the Prince Estate**.

84.      On February 12, 2019, Alfred hired the law firm Chestnut Cambrone PA ("Chestnut") to represent his interests in the Prince Estate.

85.      On February 12, 2019, Chestnut filed a Notice of Termination of Counsel signed by Alfred and stating that WWB had been terminated as of December 8, 2018, almost two months before the lawsuit against Plaintiff was filed. *See February 12, 2019 Notice of Termination of Counsel attached hereto as Exhibit 13.*

86.      On February 13, 2019, Chestnut filed an affidavit from Alfred with the court in Prince's probate case stating that Alfred had terminated WWB on December 2, 2018 through US mail and an email sent to White in which Alfred stated he was "no longer in need of It's [WWB] services and that the legal representation was terminated effective immediately". The affidavit also states that "The law firm of White, Wiggins & Barnes, LLP appears to have ignored my termination and continued to act." and that "on February 1, 2019, Attorney Corey N. Martin, partner at the law firm DAVIS, SHAPIRO, LEWIT, GRABEL, LEVIN, GRANDERSON & BLAKE LLP, located at 150 South Rodeo Drive Suite 22, Beverly Hills, CA 90212, sent a second express termination letter to WHITE WIGGINS & BARNES, LLP but despite two written and signed letters terminating the relationship with the law firm WHITE WIGGINS & BARNES, LLP... it has

proceeded in this matter without my consent." *See February 13, 2019 Affidavit of Alfred Jackson attached hereto as Exhibit 14.*

87.     Following the February 13, 2019, affidavit it appears that WWB ceased filing documents and taking action on behalf of Alfred.

**J.     Raffles recruits a Leonardo Da Vince Starke, an Attorney from Florida to represent Alfred.**

88.     Sometime in late March or early April 2019, Raffles, realizing that he was no longer in control of Alfred's attorneys, had a Florida attorney, Leonardo Da Vinci Starke ("Starke"), fly from Miami to Kansas City to meet with Alfred.

89.     Raffles and Starke convinced Alfred to hire Starke for unknown legal matters.

90.     Upon information and belief, Raffles and Starke had known each other for years and Starke had represented Raffles as his attorney in the past and/or was currently doing so.

91.     Upon information and belief, Raffles made it expressly clear to Starke and others to not tell any of Alfred's family or friends that Starke had been hired to represent Alfred.

92.     When Starke was supposedly hired, Alfred was still represented by Chestnut.

93.     Upon information and belief, Starke never contacted Chestnut nor the Special Administrator of the Prince Estate in regards to his representation of Alfred nor did he try to get any information regarding the value of Alfred's interest in Prince's Estate.

**K.     Raffles introduces Whitney Houston's Estate to Primary Wave and begins to formulate a plan to financially benefit from a sale of Alfred stake in the Prince Estate.**

94.     Upon information and belief, at some point around May 2019 Raffles introduced Whitney Houston's Estate to Primary Wave, who acquired a stake in Houston's musical assets. https://primarywave.com/primary-wave-music-publishing-announces-partnership-with-the-estate-of-whitney-e-houston/

95.     Upon information and belief, Raffles was compensated for his part in this acquisition.

96.     Upon information and belief, the fair market value of Alfred's 1/6th expectancy interest in the Prince Estate at all times in 2019 was valued at $50,000,000 or more. https://www.latimes.com/entertainment/envelope/cotown/la-et-0423-ct-prince-estate-20160423-story.html-

97.     Upon information and belief, Raffles, now working with Starke and Primary Wave, started working to get Alfred to sell his portion of the Prince Estate to Primary Wave for a steeply discounted price.

98.     On August 8, 2019, Raffles and Starke got Alfred to enter into a short-form transfer agreement with Primary Wave in which Alfred would sell 90% of his interest in Prince's Estate for $15,000,000, less than half of what most expected the value to be.

99.     Upon information and belief Raffles was to receive $300,000 for completed transfer of Alfred's interest in the Prince Estate to Primary Wave.

**L.     Chestnut withdraws from representing Alfred and Asa Weston takes over as his attorney in all legal matters.**

100.     On May 21, 2019, Chestnut withdrew from representation of Alfred and he hired Asa Weston ("Weston"), an attorney in Minnesota, to represent him in his legal matters including but not limited to Prince's Estate and investigating the loans between Alfred and Primary Wave.

101.     Upon information and belief, Alfred was never given any copies of the loan agreements he purportedly made with Primary Wave so Weston made several attempts to get copies of the loan paperwork and was rebuffed.

102.     Having Weston digging around in the loans made Raffles nervous and he started scheming ways to get Weston fired.

103.     On July 14, 2019, Raffles texted Bruce, "You free for dinner tonight? We need to talk about Alfred's Attorney. He is creating a lot of problems. What could affect you and me badly. Let me know." *See July 14, 2019 screenshot of text message between Raffles and Bruce attached hereto as Exhibit 15.*

14

104.    Upon information and belief, on August 7, 2019, the day before the short form agreement for the transfer of Alfred's interest in the Prince Estate was completed, Raffles, pretending to be Alfred, drafted and filed a Notice of Termination of Counsel with the probate court in the Prince Estate firing Weston as Alfred's attorney. *See August 7, 2019 Notice of Termination of Counsel attached hereto as Exhibit 16.*

**M.    Raffles and Alfred have a falling out, Alfred enters into the long form transfer agreement with Primary Wave for his rights in the Prince Estate and dies shortly after.**

105.    In the middle of August 2019, Raffles and Alfred had a falling out and Alfred kicked Raffles out of his house in Lee's Summit, Missouri.

106.    Raffles then went to stay at a hotel in Kansas City and a couple days later returned to Los Angeles.

107.    The day Alfred kicked Raffles out of his house Alfred called Jacqueline Mishow, a friend of Alfred's in Minneapolis, and told her that the argument was over Raffles threatening Alfred to have the attorneys change some sort of paperwork.

108.    The next day Alfred told Bruce that the fight was because Raffles was trying to replace Bruce and that Raffles threatened to get the attorneys to change some paperwork.

109.    Upon information and belief on August 27, 2019, Raffles flew from Los Angeles to Kansas City.

110.    Raffles and Starke had a meeting at Raffle's hotel on the morning of August 28, 2019, right before Starke was to meet with Alfred to finalize the Primary Wave transaction.

111.    Upon information and belief, after Raffles and Starke's meeting on August 28, 2019 Starke went to Alfred's house in Lee's Summit, Missouri to meet with Alfred.

112.    That same day, August 28, 2019, Starke had Alfred execute the long-form agreement of the Transfer of Alfred's interest in Prince's Estate

113.    Alfred passed away sometime between the night of August 28, 2019 and morning of August 29, 2019.

114.    On August 29, 2019, after being told about Alfred's death by Bruce, Raffles flew back to Los Angeles from Kansas City.

**N.     Shortly before his death Raffles had Starke draft a will for Alfred naming Raffles as sole beneficiary.**

115.    Raffles knew that Alfred had executed a will on October 7, 2016 and in fact Raffles was a witness to the signing of the will. *See October 7, 2016 Last Will and Testament of Alfred Jackson attached hereto as Exhibit 17.*

116.    Raffles was not a beneficiary of the 2016 will.

117.    On or before July 24, 2019 Raffles had Starke draft a will for Alfred naming Raffles sole beneficiary.

118.    Upon information and belief, on or around July 24, 2019, Starke flew to Kansas City to meet with Alfred and Raffles and to have Alfred execute the will.

119.    On November 13, 2019, Starke filed the July 24, 2019 will naming Raffles as the sole beneficiary. *See July 24, 2019 Last Will and Testament of Alfred Frank Alonzo Jackson attached hereto as Exhibit 18.*

**O.     WWB submits a claim to Alfred's Estate in the amount of $177,176.32 with no billings related to the lawsuit filed against Plaintiff.**

120.    On July 16, 2020, WWB submitted a claim against Alfred's Estate in the amount of $177,176.32. *See July 16, 2020 Claim Against the Estate of Alfred Frank Alonzo Jackson attached hereto as Exhibit 19.*

121.    The line item billings include hundreds of entries but zero of those entries related to any work WWB did for Alfred regarding the lawsuit filed against Plaintiff.

122.    WWB's claim for money owed to them by Alfred's Estate directly contradicts what they told Alfred regarding their engagement and their engagement letter with Alfred which states "WWB will submit monthly invoices to the administrator of the Prince Estate, which we understand at this time to be Comerica Bank. All payment are to be paid from the Prince Estate until the parties agree otherwise." *See Exhibit 2.*

16

123.     Along with the lies that WWB told Alfred regarding Plaintiff stealing money, Alfred relied on the notion that he would not have to pay any legal fees because WWB would be paid by the Special Administrator of the Prince Estate when terminating Plaintiff and hiring WWB.

**Specific Claims For Relief**

**Count 1**
**Defamation Per Se**
**(Against Defendant Raffles)**

124.     Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

125.     Plaintiff is informed and believes Defendant Raffles by the herein-described acts, conspired to, and in fact, did negligently, recklessly, and intentionally cause external statements of defamation, of and concerning Plaintiff, to third persons and to the community to be published.

126.     Defendant Raffles made oral statements to Alfred and Bruce that Plaintiff "didn't like black people."

127.     Defendant Raffles made oral statements to Alfred and Bruce that Plaintiff had stolen money from Alfred.

128.     Defendant Raffles made statements to Lythcott, Alfred and Bruce that Plaintiff has stolen $500,000 from Alfred.

129.     Defendant Raffles statements in paragraphs 126 through 128 were false and defamatory.

130.     As a proximate result of the publication and republication of these defamatory statements by Defendant Raffles, Plaintiff has suffered injury to his personal, business, and professional reputation including suffering embarrassment, humiliation, severe emotional distress, shunning, anguish, fear, loss of employment, and employability, and significant economic loss in the form of lost earnings and future earnings, all to Plaintiff's economic, emotional, and general damage in an amount in excess of $75,000.

**Count 2**

17

**Defamation Per Se**
**(Against Defendants White, Barnes and WWB)**

131.    Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

132.    Plaintiff is informed and believes Defendants White and Barnes individually and in their capacity as managing partners of WWB by the herein-described acts, conspired to, and in fact, did negligently, recklessly, and intentionally cause external statements of defamation, of and concerning Plaintiff, to third persons and to the community to be published.

133.    Defendants White and Barnes individually and in their capacity as managing partners of WWB told Alfred and Bruce that Plaintiff stole money from Alfred on multiple occasions in October 2018 through December 2018.

134.    Defendants White's and Barnes' individually and in their capacity as managing partners of WWB statements to Alfred and Bruce were false and defamatory.

135.    Defendants White and Barnes individually and in their capacity as managing partners of WWB made the following statements to Raffles, Bruce, Alfred and Lythcott on or around December 14, 2018.

A. Plaintiff stole $500,000 from Alfred.

B. White and Barnes had spent hours at the bank with Alfred and were unable to find where Plaintiff transferred any portion of the $500,000

C. That White and Barnes had copies of all of Alfred's bank statement and there is no evidence that Alfred ever received any portion of the $500,000.

D. That White had been doing this for over 20 years and that Plaintiff's acts were criminal.

136.    Defendants White's and Barnes' individually and in their capacity as managing partners of WWB statements to Raffles, Bruce, Alfred and Lythcott were false and defamatory.

137.    As a proximate result of the publication and republication of these defamatory statements by Defendants White and Barnes individually and in their capacity as named Partners of WWB, Plaintiff has suffered injury to his personal, business, and professional reputation

18

including suffering embarrassment, humiliation, severe emotional distress, shunning, anguish, fear, loss of employment, and employability, and significant economic loss in the form of lost earnings and future earnings, all to Plaintiff's economic, emotional, and general damage in an amount in excess of $75,000.

**Count 3**
**Defamation Per Se**
**(Against Defendants Barnes, WWB, Cutler and Tippin)**

138.   Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

139.   Defendants Barnes, individually and in his capacity as a managing partner of WWB, and Cutler, individually and in his capacity as a partner at Tippin, by the herein-described acts, conspired to, and in fact, did negligently, recklessly, and intentionally cause external statements of defamation, of and concerning Plaintiff, to third persons and to the community to be published.

140.   Defendants Barnes, individually and in his capacity as a managing partner of WWB, and Cutler, individually and in his capacity as a partner at Tippin drafted, signed off on and later filed the lawsuit against Plaintiff on January 31, 2019.

141.   The lawsuit specifically states:

A. Alfred fired Plaintiff because of his lack of experience and inability to represent his interests in Prince's probate matter.

B. No portion of the $500,000 December 22, 2017 disbursement was ever received by Alfred.

C. That Plaintiff to date has refused to provide the requested information and has provided no explanation for the missing funds.

142.   Defendants Barnes', individually and in his capacity as a managing partner of WWB, and Cutler's, individually and in his capacity as a partner at Tippin statements in the lawsuit were false and defamatory.

143.    Defendants Barnes, individually and in his capacity as a managing partner of WWB, and Cutler, individually and in his capacity as a Partner at Tippin knew or should have known their statements in the lawsuit against Plaintiff were false and defamatory.

144.    Defendants Barnes, individually and in his capacity as a managing partner of WWB, and Cutler, individually and in his capacity as a Partner at Tippin did not represent Alfred at the time the lawsuit was filed.

145.    As a result of the lawsuit TheBlast.com published an article on the internet stating Plaintiff has stolen $500,000 from Alfred. The article was later picked up by other media sources.

146.    As a proximate result of the publication and republication of these defamatory statements by Defendants Barnes, individually and in his capacity as a managing partner of WWB, and Cutler, individually and in his capacity as a partner at Tippin, Plaintiff has suffered injury to his personal, business, and professional reputation including suffering embarrassment, humiliation, severe emotional distress, shunning, anguish, fear, loss of employment, and employability, and significant economic loss in the form of lost earnings and future earnings, all to Plaintiff's economic, emotional, and general damage in an amount in excess of $75,000.

### **Count 4**
### **Tortious Interference With Contract**
### **(Against Defendants Raffles, White, Barnes and WWB)**

147.    Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

148.    Defendants Raffles and White and Barnes, individually and as managing partners of WWB, were aware that a contract for legal representation existed between Plaintiff and Alfred

149.    Defendants Raffles and White and Barnes, individually and as managing partners of WWB, improperly and intentionally interfered with the performance of that contract when they induced Alfred to terminate Plaintiff and hire WWB by making false allegations and statements against Plaintiff along with promises of Alfred not having to pay WWB's legal fees.

150.   As a proximate result of the tortious interference of Plaintiff's contract by Defendants Raffles and White and Barnes, individually and as managing partners of WWB, Plaintiff has suffered injury to his personal, business, and professional reputation including suffering embarrassment, humiliation, severe emotional distress, shunning, anguish, fear, loss of employment, and employability, and significant economic loss in the form of lost earnings and future earnings, all to Plaintiff's economic, emotional, and general damage in an amount in excess of $75,000.

### Count 5
### Tortious Interference With Prospective Economic Advantage
### (Against Defendants Raffles, White, Barnes and WWB)

151.   Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

152.   As Alfred's attorney Plaintiff had a reasonable expectation of economic advantage.

153.   Defendants Raffles and White and Barnes, individually and as managing partners of WWB had or should have had knowledge of the expectation of economic advantage.

154.   Defendants Raffles and White and Barnes, individually and as managing partners of WWB intentionally interfered with this expectation when they made false statements about Plaintiff to Alfred and false promises to Alfred and induced Alfred to fire Plaintiff.

155.   If not for the wrongful acts by Defendants Raffles and White and Barnes, individually and as managing partners of WWB, Alfred would not have terminated Plaintiff from representing him.

156.   As a proximate result of the tortious interference with prospective advantage by Defendants Raffles and White and Barnes, individually and as managing partners of WWB, Plaintiff has suffered injury to his personal, business, and professional reputation including suffering embarrassment, humiliation, severe emotional distress, shunning, anguish, fear, loss of employment, and employability, and significant economic loss in the form of lost earnings and

future earnings, all to Plaintiff's economic, emotional, and general damage in an amount in excess of $75,000.

### Count 6
### Civil Conspiracy to Tortuously Interfere with Contract
### (Against Defendants Raffles, White, Barnes and WWB)

157.     Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

158.     Defendants Raffles and White and Barnes, individually and as managing partners of WWB, conspired together with the objective to tortuously interfere with the contract between Alfred and Plaintiff by having Alfred terminate Plaintiff from legal representation and replace him with WWB.

159.     Defendants Raffles and White and Barnes, individually and as managing partners of WWB agreed to tell Alfred false allegations and statements in the form of Plaintiff stealing money from Alfred in order to accomplish their objectives.

160.     Raffles and White and Barnes individually and as managing partners of WWB also conspired to tell Alfred that he would not be responsible for WWB's legal fees and that Prince's Estate would pay all their bills.

161.     Defendants Raffles and White and Barnes, individually and as managing partners of WWB, communicated to Alfred these false allegations and statements about Plaintiff and that WWB would not bill Alfred for legal fees in an attempt to further their objective to get Alfred to terminate Plaintiff and replace him with WWB.

162.     Defendants Raffles and White's and Barnes', individually and as managing partners of WWB, wrongful conduct caused Alfred to terminate Plaintiff and replace him with WWB.

163.     As a proximate result of the of the conspiracy to interfere by Defendants Raffles and White and Barnes, individually and as managing partners of WWB, Plaintiff has suffered injury to his personal, business, and professional reputation including suffering embarrassment,

humiliation, severe emotional distress, shunning, anguish, fear, loss of employment, and employability, and significant economic loss in the form of lost earnings and future earnings, all to Plaintiff's economic, emotional, and general damage in an amount in excess of $75,000.

### Count 7
### Civil Conspiracy to Defame
### (Against Defendants Raffles, White, Barnes and WWB)

164.    Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

165.    Defendants Raffles and White and Barnes, individually and as managing partners of WWB, conspired together to defame Plaintiff by falsely alleging to Bruce, Alfred and Lythcott that Plaintiff stole money from Alfred.

166.    Defendants Raffles and White and Barnes, individually and as managing partners of WWB, agreed to tell Alfred and others false allegations and statements regarding Plaintiff stealing $500,000 in order to accomplish their objectives.

167.    Defendants Raffles and White and Barnes, individually and as managing partners of WWB, communicated to Alfred, Bruce and Lyhtcott these false allegations and statements about Plaintiff to help further their objective to get Alfred to terminate Plaintiff and replace him with WWB.

168.    As a proximate result of the of the conspiracy by Defendants Raffles, White and Barnes, individually and as managing partners of WWB, Plaintiff has suffered injury to his personal, business, and professional reputation including suffering embarrassment, humiliation, severe emotional distress, shunning, anguish, fear, loss of employment, and employability, and significant economic loss in the form of lost earnings and future earnings, all to Plaintiff's economic, emotional, and general damage in an amount in excess of $75,000.

### Count 8
### Civil Conspiracy to Defame
### (Against Defendants White, Barnes, WWB, Cutler and Tippin)

169.   Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

170.   Defendants White and Barnes, individually and in their capacity as managing Partners of WWB, and Cutler, individually and in his capacity as a Partner at Tippin conspired together with the objective to defame Plaintiff.

171.   Defendants White and Barnes, individually and in their capacity as managing Partners of WWB, and Cutler, individually and in his capacity as a Partner at Tippin were not representing Alfred at the time and did not have his authorization to file the January 31, 2019 lawsuit against Plaintiff.

172.   Defendants White and Barnes, individually and in their capacity as managing Partners of WWB, and Cutler, individually and in his capacity as a Partner at Tippin agreed to file a lawsuit with false allegations that Plaintiff stole $500,000 from Alfred.

173.   Defendants White and Barnes, individually and in their capacity as managing Partners of WWB, and Cutler, individually and in his capacity as a Partner at Tippin filed this lawsuit on January 31, 2019.

174.   Defendants White and Barnes, individually and in their capacity as managing Partners of WWB, and Cutler, individually and in his capacity as a Partner at Tippin actions caused an online media source to publish an article about these false allegations against Plaintiff and this article was later picked up by other media sources.

175.   As a proximate result of the conspiracy by Defendants White and Barnes, individually and in their capacity as managing Partners of WWB, and Cutler, individually and in his capacity as a Partner at Tippin, Plaintiff has suffered injury to his personal, business, and professional reputation including suffering embarrassment, humiliation, severe emotional distress, shunning, anguish, fear, loss of employment, and employability, and significant

economic loss in the form of lost earnings and future earnings, all to Plaintiff's economic, emotional, and general damage in an amount in excess of $75,000.

**Count 9**
**Abuse of Process**
**(Against Defendants White, Barnes, WWB, Cutler and Tippin)**

176.   Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

177.   Defendants White and Barnes, individually and in their capacity as managing Partners of WWB, and Cutler, individually and in his capacity as a Partner at Tippin, filed a lawsuit against Plaintiff on January 31, 2019.

178.   Defendants White and Barnes, individually and in their capacity as managing Partners of WWB, and Cutler, individually and in his capacity as a Partner at Tippin, filed the lawsuit against Plaintiff knowing that Plaintiff did not steal $500,000 from Alfred but with an ulterior motive of intimidating, embarrassing and harming Plaintiff's reputation among other things.

179.   Defendants White and Barnes, individually and in their capacity as managing partners of WWB, and Cutler, individually and in his capacity as a Partner at Tippin filed the lawsuit against Plaintiff knowing that Plaintiff did not steal $500,000 from Alfred but with the ulterior motive of getting Alfred to rehire them as their legal representatives.

180.   Defendants White and Barnes, individually and in their capacity as managing partners of WWB, and Cutler, individually and in his capacity as a partner at Tippin were not representing Alfred at the time and did not have his authorization to file the lawsuit on Alfred's behalf.

181.   Defendants White's and Barnes', individually and in their capacity as managing partners of WWB, and Cutler's, individually and in his capacity as a Partner at Tippin, actions caused an online media source to publish false allegations against Plaintiff, which was later picked up by other online media sources.

25

182.    As a proximate result of the of the abuse of process by Defendants White and Barnes, individually and in their capacity as managing partners of WWB, and Cutler, individually and in his capacity as a partner at Tippin, Plaintiff has suffered injury to his personal, business, and professional reputation including suffering embarrassment, humiliation, severe emotional distress, shunning, anguish, fear, loss of employment, and employability, and significant economic loss in the form of lost earnings and future earnings, all to Plaintiff's economic, emotional, and general damage in an amount in excess of $75,000.

## Prayer for Relief

**WHEREFORE,** Petitioner prays for Judgment as follows to be entered against Defendants

A. An injunction permanently restraining Defendants from engaging in the unlawful conduct described herein.

B. An award of damages, in a sum in excess of seventy five thousand dollars ($75,000) to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic harm, including, but not limited to, the loss of past and future income, wages, compensation, and other benefits;

C. An award of damages, in a sum in excess of the seventy five thousand dollars ($75,000) to compensate Plaintiff for all non-monetary and compensatory harm, including, but not limited to, compensation for his depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, harm to his personal and professional reputations and loss of career fulfillment;

D. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

E. An award of Punitive Damages against all Defendants;

F. An award of costs that Plaintiff has incurring in this action, as well as Plaintiff's reasonable attorneys' fees and costs of prosecuting this action to the fullest extent permitted by law;

H. For such other and further relief as the Court deems just and proper.

## Jury Demand

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: August 24, 2020                    ELEFTERAKIS, ELEFTERAKIS, & PANEK

*/s/ Lee A. Hutton, III*
Lee A. Hutton, III (#0327992)
Tractor Works Building
800 Washington Ave N., Suite 620
Minneapolis, Minnesota 55401
lhutton@eeplaw.com
lhutton@elefterakislaw.com

## **ACKNOWLEDGEMENT**

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney and witness fees may be awarded pursuant to Minn. Stat. §549.21, subd. 2, to the parties against whom the allegations in this pleading are asserted.

Dated: August 24, 2020                  ELEFTERAKIS, ELEFTERAKIS, & PANEK

*/s/ Lee A. Hutton, III*
Lee A. Hutton, III (#0327992)
Tractor Works Building
800 Washington Ave N., Suite 620
Minneapolis, Minnesota 55401
lhutton@eeplaw.com
lhutton@elefterakislaw.com