**UNITED STATES DISTICT COURT**
**DISTRICT OF MINNESOTA**

---

Justin Andrew Bruntjen Esq.,

Plaintiff, Court File No.: 20-CV-01832-MJD-KMM

v.

Raffles Van Excel, individually, White, Wiggins & Barnes, LLP, a Texas law firm; Ward Allen White IV, individually; Kennedy Lowell Barnes, individually; James W. Tippin & Associates, a Missouri law firm, and Keith Anthony Cutler, individually;

Defendants.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS WHITE, WIGGINS & BARNES, LLP, WARD ALLEN WHITE IV, KENNEDY LOWELL BARNES, KEITH CUTLER AND JAMES W. TIPPIN & ASSOCIATES MOTION TO DISMISS PURSUANT TO RULE 12 (B)(2) AND RULE 12 (B)(6)**

---

## Introduction

Defendants White, Wiggins & Barnes, LLP ("WWB"), WWB Partner Ward A. White IV and WWB Partner Kennedy L. Barnes (collectively "WWB Defendants") and Keith A. Cutler and Tippin & Associates (collectively "Tippin Defendants") have filed separate motions to dismiss ("Motions") based on Federal Rule of Civil Procedure 12(b)(2) or alternatively Rule 12(b)(6). Plaintiff opposes these motions based on the facts and arguments set forth below.

## Factual Background

### A. Background Facts[1].

Plaintiff, Justin Bruntjen ("Bruntjen"), an attorney and resident of Minnesota, started representing Alfred Jackson ("Alfred") in April 2016, when Alfred's half-brother Prince Rogers Nelson ("Prince") died intestate. Prince was an internationally acclaimed musician and at the time of Prince's death Alfred was a resident of Minnesota, living in Waite Park.

[1] Plaintiff adopts the facts contained in his Complaint.

Bruntjen was initially hired by Alfred to represent him in the Probate of Prince's Estate which litigation commenced in Carver County, Minnesota in April of 2016 and is still ongoing. Over time the scope of Bruntjen's representation of Alfred increased to include all legal matters. Bruntjen and Alfred's agreement for Bruntjen to represent him were executed in two written retainers. Both these agreements indicated the majority of work performed by Bruntjen would be in regard to the Prince Estate litigation in Carver County, Minnesota. Bruntjen was Alfred's attorney for over two and a half years from the end of April 2016 through November 1, 2018.

Alfred, along with five other half and full siblings of Prince, were initially disputed heirs to Prince's estate. Because of the numerous amounts of claimants disputing the heirship to Prince's Estate, Alfred wasn't determined to be a legal heir until a Court Order on May 18, 2017, over a year after Prince's death.

**B. Facts Relevant to Jurisdiction.**

1. Raffles Van Exel

Immediately following Prince's death Raffles Van Exel ("Raffles") an acquaintance of Bruce Jackson ("Bruce"), Alfred's brother, called Bruce in Kansas City, Missouri. Raffles told Bruce that he should fly to Minnesota and take Alfred out of the long-term care facility he was living at in Waite Park. (Compl. ¶ 29) Seeing Alfred as a potential "mark" to con, Raffles flew to Minneapolis to meet with Bruce and him on or around April 23, 2016. Upon meeting Alfred in Minneapolis Raffles made himself out to be an important and influential entertainment advisor with experience that included working for Alfred's late brother, Prince. Raffles misrepresentation of his qualifications seemed to work on Alfred and Raffles was able to get Alfred to sign a "Letter of Agreement" on April 23, 2016. As compensation in the agreement

Raffles was to be paid ten percent (10%) of money received by Alfred from the Prince Estate and other deals. See Exhibit 1 of the Complaint*;* Id ¶ 29-31.

Raffles, whose real name is unknown and has gone by a variety of aliases, is an individual with a very colorful history with Musicians and other celebrities. According to news sources Raffles was in the hotel room of Whitney Houston at or shortly after the moment she was found dead from a drug overdose and he removed evidence from the room prior to police arriving. Id ¶ 14.

Raffles produced the video: https://www.youtube.com/watch?v=YSF1aPLF2sY portions of which are publicly available on YouTube, wherein he describes the art of the Hollywood con and how to get close to celebrities. Id. ¶ 19. The Raffles video catalogs a series of lies and deceit in order for Raffles to achieve his goals. Id. ¶ 24. One of Raffles personal rules is to "show no shame." This equates to "lying to a blind man" to get what you want as demonstrated in his video. Id. ¶ 26. The life mantra and talent for being a con and playing people to advance his own purposes was in full display and effect during the time Raffles worked himself into Alfred Jackson's ("Alfred") circle. Id. ¶ 27.

For months between April 2016 and January 2017 Raffles ran his "con" on Alfred trying to find ways to benefit from Alfred's status as a presumed heir to Prince's Estate. Raffles traveled to Kansas City to visit Alfred, attended multiple court dates in Chaska, Minnesota and other events in Minneapolis. Using Alfred, Raffles gained access to award shows and parties, some which he attended with Alfred. In order to further ingratiate himself to Alfred, Raffles acted as a gopher for Alfred getting him food, drinks, medication and running other errands. Id. ¶ 35.

Around late December 2016 or early January 2017, Raffles brought Alfred to a Wells Fargo in Minneapolis and had Alfred open a bank account in both Raffle's and Alfred's name. Id. ¶ 36. This action by Raffles caused a falling out between Alfred and Raffles that lasted until sometime in early 2018.

Besides claiming to have worked in Minnesota for Prince, prior to his death, Raffles also did some work for Evine in 2017 and 2018, a company head quartered in Eden Prairie, Minnesota.

Beginning around September 2018, Raffles began staying with Alfred at his house in Lee's Summit, Missouri on an almost regular basis and continued traveling back and forth to Minnesota to attend Alfred's court appearances and other events.

On September 25, 2018, Raffles sent Bruce an email with an attached document he had drafted entitled "termination of employment and representation" Raffles instructed Bruce to "print this letter and let Alfred sign it. Once its signed, email it to Justin, Joseph Cassioppi, Angela Aycock, Raffles Van Exel and yourself." After receiving this email a representative from Comerica, Angela Aycock, called Alfred and asked him if he wanted to fire Bruntjen at which time Alfred told her that he did not. Following the unsuccessful attempt to get Bruntjen terminated Raffles realized he need another attorney or law firm in place and ready to take over so they could act as a gatekeeper to the communications between Alfred and Comerica. Id. ¶ 47-49.

**2. WWB Defendants.**

At some point around the end of September or beginning of October 2018, Raffles made the acquaintance of the WWB Defendants. Raffles worked with the WWB Defendants to try and get Alfred to terminate his agreement for representation with Bruntjen and replace him with

WWB. This included WWB Defendants and Raffles telling Alfred that Bruntjen stole money from him and that Alfred needed to hire WWB to get it back. WWB Defendants and Raffles also had Alfred sign an engagement letter stating that Alfred would not have to pay WWB any money for their services. See Exhibit 3 of Complaint. The engagement letter specifically states that "WWB will submit monthly invoices to the administrator of the Prince Estate, which we understand at this time to be Comerica Bank. Id. at Paragraph 3. All payments are to be paid from the Prince Estate until the parties agree otherwise." Id.

The idea that Alfred would not have to pay legal fees was a contributing factor in trying to get WWB to replace Bruntjen as Alfred's attorneys. In order for Raffles to benefit from their representation of Alfred, WWB Defendants and Raffles put a provision in their engagement letter stating "WWB will engage the consulting services of Mr. Raffles Van Exel. Fees for Mr. Van Exel's services will be included in our invoice and billed to the Prince Estate." Id. Raffles and WWB accomplished their goal on November 2, 2018 when Bruntjen was terminated and replaced by WWB as Alfred's counsel. See Complaint at Id. ¶ 50-54. Finally, WWB's engagement clearly connects their representation to the Internet of Alfred Jackson as an heir to the Prince estate.

Subsequently to November 2, 2018, the WWB Defendants were admitted Pro Hac Vice in Minnesota for purposes of representing Alfred in the Prince Estate Litigation. Barnes Decl. ¶ 8. During his time representing Alfred, Barnes made multiple trips to Minnesota to perform duties related to that representation including attending hearings in Carver County. Id. ¶ 11. Barnes drafted numerous documents to file in Prince's probate matter and corresponded with numerous parties located in Minnesota that were involved with the estate.

Likewise, Ward White IV was admitted Pro Hac Vice in Minnesota in November 2018 for the purpose of representing Alfred in Prince's Probate matter in Carver County. White Decl. ¶ 7. Although his declaration seems to intentionally omit how many times he has been to Minnesota White does say that he attended court in Carver County for purposes of representing Alfred in the Prince Estate Litigation. Id. ¶ 10. White also drafted numerous documents to file in Prince's probate and corresponded with numerous parties located in Minnesota that were involved with the estate.

On December 2, 2018, Alfred terminated the representation of the WWB Defendants. See Complaint Exhibit 6.

3. **Tippin Defendants.**

On January 31, 2019 Plaintiff received an email from Defendant Barnes with a complaint attached. The complaint named Plaintiff as the Defendant and accused Plaintiff of stealing $500,000 from Jackson. The lawsuit was filed in the United States District Court for the Western District of Missouri and signed off on by the Tippin Defendants. Compl. ¶ 70-72. Tippin Defendants conspired with the WWB Defendants and Raffles in their actions regarding filing this lawsuit. The complaint raises Minnesota legal theories.

C. **Facts Relevant to Absolute Immunity.**

At some point in early December 2018, Bruntjen learned that Alfred had terminated WWB Defendants representation on December 2, 2018. Id. ¶ 62.

On December 14, 2018, Bruntjen received a call from Michael Lythcott, a friend of Alfred's and agent for the lenders of Alfred's loan, stating that he was with Bruce, Raffles and Alfred at Alfred's house in Lee's Summit, Missouri and they had been talking to the WWB Defendants on the phone and that WWB along with Raffles were telling Alfred, Lythcott and

Bruce that Plaintiff had stolen a $500,000 loan disbursement from Alfred that was due him toward the end of December 2017. Id. ¶ 63. WWB Defendants told Alfred, Raffles, Lythcott and Bruce that he and Defendant Barnes had spent hours at the bank with Alfred and there was no record of Alfred receiving any of the money from Bruntjen in December 2017. Id. ¶63, 64; Barnes Decl . ¶ 19; Ward Decl . ¶ 18. During this meeting WWB Defendants said they had copies of Alfred’s bank statements, which they had extensively reviewed, proving Alfred never received the December 2017 wire from Bruntjen but refused to let Lythcott or anyone else see these statements. Also during this telephone call White accused Bruntjen of being a criminal and said that White had been doing this for twenty years and he was positive Bruntjen stole the money. Id. ¶ 66, 67. Barnes Decl . ¶ 18, 20; Ward Decl . ¶ 17.

Lythcott confronted Bruntjen with these allegations and Bruntjen immediately sent Lythcott confirmation that $450,000 ($500,000 minus $50,000 in fees for Plaintiff) was wired to Jackson on December 27, 2017. Upon information and belief Lythcott then forwarded the wire confirmation to WWB Defendants. Id. ¶ 65.

On December 21, 2018, Bruntjen received an email from Barnes with a letter attached stating this time that Bruntjen had “deducted $100,000 [from Alfred] from a disbursement without authority”. Id. ¶ 68.

On December 23, 2018, Bruntjen sent Barnes a response to the December 21, 2018 letter stating that the allegations they [WWB] were making against Bruntjen “have been fabricated and or they have absolutely no bases in fact whatsoever”. Bruntjen demanded that WWB stop spreading falsities and informed them that their comments were defamatory and easily proven false. The letter also stated that Bruntjen was aware that WWB had been terminated by Alfred on December 2, 2018 and that before he would provide anything to WWB he needed written

authorization that Alfred had rehired them and the scope of such representation. The letter further informed Barnes that Bruntjen had contacted representatives of the Prince Estate and confirmed that they had not had any contact with anyone from WWB since the December 2, 2018 termination letter. Id. ¶ 69.

WWB and Tippin Defendants claim that WWB attorneys requested information from Bruntjen demonstrating that he had paid Alfred the third installment, which would be $450,000 after Bruntjen applied his fees and that Bruntjen did not provide sufficient information to allow them to locate this third disbursement. Barnes Decl. ¶ 20. This again is simply not true. None of the WWB Defendants ever contacted Bruntjen requesting any proof of the December 2017 $500,000 transfer to Alfred. The first-time Bruntjen heard anything about the claim that the third installment was never paid to Alfred was when Lythcott called him in December of 2018.

The WWB Defendants admit to discussing the (fictitious) “missing” funds with Raffles and Lythcott. Id. ¶ 21; Ward Decl. ¶ 19. They also claim they did “a search of US Bank’s records” and there was no record of the funds prior to filing the lawsuit. Tippin Motion to Dismiss pg 2, 3. If true and WWB and Tippin Defendants did in fact have Alfred’s bank records they knowingly proceeded telling people Bruntjen stole money with intentional and malicious intent knowing their claims were false. Any review of Alfred’s December 2017 bank records would have showed the receipt of the funds for the third installment. Alfred only had one bank account in December of 2017 so the review of these records would not have been a strenuous or complicated task to undertake. Further, how would a person or persons with twenty plus years experience miss a $500,000 payment into an account when they know the precise date or time period it was deposited?

Bruntjen did not have any further communication with WWB Defendants until January 31, 2019 when Bruntjen received an email from Barnes with a complaint attached. The complaint named Bruntjen as the Defendant and accused him of stealing $500,000 from Alfred. The lawsuit was filed in the United States District Court for the Western District of Missouri and signed off on by WWB and Tippin Defendants Id. ¶ 70-72. Upon information and belief, Tippin never spoke to Alfred concerning representing him, had no written agreement to represent him, never billed Alfred nor received any money for any work performed by the Tippin Defendants.

From February 2 through February 4 2019, Bruntjen requested numerous times on the phone and through email, to get law enforcement involved because if the allegations in the lawsuit were true Bruntjen would have been guilty of a crime. WWB Defendants repeatedly refused to involve law enforcement. Then on February 5, 2019, the money "magically" appeared in Alfred's account out of nowhere and backdated to December 2017 because WWB Tippin Defendants dismissed the lawsuit and sent Bruntjen a copy of the Notice of Dismissal. Id. ¶ 79,80.

On February 12, 2019, Alfred hired the law firm Chestnut Cambrone PA ("Chestnut") to represent his interests in the Prince Estate. On that same date Chestnut filed a Notice of Termination of Counsel signed by Alfred and stating that WWB had been terminated as of December 8, 2018, almost two months before the lawsuit against Bruntjen was filed. Then on February 13, 2019, Chestnut filed an affidavit from Alfred with the court in Prince's probate case stating that Alfred had terminated WWB on December 2, 2018 through US mail and an email sent to White in which Alfred stated he was "no longer in need of It's [WWB] services and that the legal representation was terminated effective immediately". The affidavit also states that "The law firm of White, Wiggins & Barnes, LLP appears to have ignored my termination and

continued to act." and that "on February 1, 2019, Attorney Corey N. Martin, partner at the law firm DAVIS, SHAPIRO, LEWIT, GRABEL, LEVIN, GRANDERSON & BLAKE LLP, located at 150 South Rodeo Drive Suite 22, Beverly Hills, CA 90212, sent a second express termination letter to WHITE WIGGINS & BARNES, LLP but despite two written and signed letters terminating the relationship with the law firm WHITE WIGGINS & BARNES, LLP... it has proceeded in this matter without my consent." Id. ¶ 84-86.

On July 16, 2020, WWB submitted a claim against Alfred's Estate in the amount of $177,176.32. The line item billings include hundreds of entries but zero of those entries related to any work WWB or Tippin Defendant's performed for Alfred regarding the lawsuit filed against Bruntjen. WWB's claim for money owed to them by Alfred's Estate directly contradicts what they told Alfred regarding their engagement and their engagement letter with Alfred which states "WWB will submit monthly invoices to the administrator of the Prince Estate, which we understand at this time to be Comerica Bank. All payments are to be paid from the Prince Estate until the parties agree otherwise." Along with the lies that WWB told Alfred regarding Bruntjen stealing money, Alfred relied on the notion that he would not have to pay any legal fees because WWB would be paid by the Special Administrator of the Prince Estate when terminating Bruntjen and hiring WWB. Id. ¶ 120-123.

## <u>ARGUMENT</u>

### I. RULE 12 (B) (2) STANDARD.

#### a. Defendants' Collective Attempt Seeking Dismissal Pursuant to Rule 12 (b) (2) is Properly Denied.

Defendants improperly seek dismissal pursuant to F.R.Civ.P. 12 (b)(2) for due process reasons arguing that this court does not have personal jurisdiction over them. In the case of a non-resident defendant (as frequently chirped by the Defendants), Minnesota courts have held

that the Minnesota long-arm statute is satisfied when the nonresident's contacts satisfy due process. See *Valspar Corp. v. Lukken Color Corp*., 495 N.W.2d 408, 410 (Minn. 1992). Thus, this court's exercise of jurisdiction over Defendants is constrained only by the "traditional notions of fair play and substantial justice", in the Due Process Clause of the Constitution. See *International Shoe Co., v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). These traditional notions of fair play and substantial justice are satisfied if the defendant has sufficient "minimum contacts" with the forum state. *World-Wide Volkswagen Corp. V. Woodson*, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed2d 490 (1992). A defendant's contacts with Minnesota are sufficient if the nonresident defendant "should reasonably anticipate being hauled into court there," *World-Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S.Ct. at 567, because it has performed "'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."' *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985) (*quoting Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)). The inquiry is whether the non-resident defendant "has 'purposefully directed' his activities at residents of the forum ... and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King*, 471 U.S. at 472, 105 S.Ct. at 2182 (citations omitted).

The Eighth Circuit has enumerated several factors in determining whether a district court's exercise of jurisdiction over a non-resident defendant is consistent with due process: (1) "the nature and quality of defendant's contacts with the forum state; (2) quantity of contacts; (3) source and connection of the cause of action with those contacts; and, to a lesser degree, (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the

parties." *Gould v. P.T. Krakatau Steel*, 957 F.2d 573, 576. However, the latter two issues are "secondary factors" in the inquiry. *Northrup King Co. v. Compania Productora Semillas Algondoneras Selectas, S.A.*, 51 F.3d 1383, 1387 (8thCir. 1995) (*citing Aaron Ferer & Sons Co. v. American Compressed Steel Co*., 564 F.2d 1206, 1210 n. 5 (8th Cir.1977). Because the first three factors are closely interrelated, they are considered together. *Northrup King Co*., 51 F.3d at 1387.

Finally, in determining whether Plaintiff has met its burden in establishing jurisdiction, the Court must view all evidence in the light most favorable to Plaintiff and resolve all factual disputes in Plaintiff's favor. *See Digi-Tel Holdings, Inc. v. Proteq Telecomm. Ltd*., 89 F.3d 519, 522 (8th Cir. 1996).

## II. The WWB Defendants Have Sufficient Minimum Contacts Purposefully Directed at Plaintiff who is a Minnesota Resident.

The WWB Defendants are simply incorrect when they argue that Plaintiff fails to demonstrate any contacts between the WWB Defendants and Minnesota. Sufficient minimum contacts exist between the WWB Defendants such that the exercise of jurisdiction is proper. Nothing about the exercise of jurisdiction here over the WWB Defendants should offend any notion of fair play and substantial justice.

### A. The WWB Defendants Satisfy the Five-Factor Test for Minimum Contacts.

#### 1. The nature and quality of the contacts with the forum state; quality contact to the forum; and the relation to the contact all fall in favor of Plaintiff.

Raffles who is the infamous self-proclaimed con-artist made the acquaintance of the WWB Defendants. Raffles and the WWB Defendants worked together to terminate the representation agreement with Plaintiff to replace him with WWB. The WWB Defendants were successful to convince Alfred to terminate the attorney-client relationship albeit on false

information.

WWB Defendants and Raffles concocted a false narrative to tell Alfred that Bruntjen stole money from him in his and that Alfred needed to hire WWB to get it back. WWB Defendants and Raffles also told Alfred that he would not be responsible for any legal fees because they would be paid by the Prince Estate. Plaintiff's only contact with Alfred arises out of the Prince Estate Litigation. Eventually, the WWB Defendants and Raffles convinced Alfred to hire them to pursue monies that was allegedly stolen by Plaintiff.

On November 2, 2018, the WWB Defendants were admitted Pro Hac Vice in Minnesota for purposes of representing Jackson in the Prince Estate Litigation. Barnes Decl. ¶ 8. During his time representing Alfred, Barnes made multiple trips to Minnesota to perform duties related to that representation including attending hearings in Carver County and including advising Alfred the alleged misdeeds of Plaintiff. Id. ¶ 11. Barnes also drafted numerous documents to file in Prince's probate matter and corresponded with numerous parties located in Minnesota that were involved with the estate.

Likewise, Ward White IV was also admitted Pro Hac Vice in Minnesota in November 2018 for the purpose of representing Alfred in Prince's Probate matter in Carver County. White Decl. ¶ 7. White admits that he attended court in Carver County for purposes of representing Alfred in the Prince Estate Litigation. Id. ¶ 10. White also assisted in the drafting of numerous documents to file in Prince's probate and corresponded with numerous parties located in Minnesota that were involved with the estate.

No doubt, the WWB Defendants made it clear that they were involved with the Prince litigation. In fact, WWB submitted invoices and made travels to Minnesota rendering their contacts valid and deep in Minnesota.

**2. The interest of the forum state in providing a forum for its residents.**

Here, the WWB Defendants pursued the agenda to seek Minnesota legal malpractice claims against a Minnesota attorney. They attempted to seek claims in a foreign jurisdiction despite their substantial contacts with Minnesota. To add more insult to the matter, Plaintiff later discovered that the WWB defendants did not have proper authority to even represent Alfred. See Complaint, Exhibits 6 and 14.

**3. The Convenience of the Parties.**

The Convenience of the party's standard supports a finding of jurisdiction. Most of the witnesses including those individuals involved in the Prince Estate Litigation, the James Selmer Law firm who acted as local counsel, the Estate Attorneys, the Carver County Filings, and other documents are all located in Minnesota.

**B. The Tippin Defendants Have Sufficient Minimum Contacts Purposefully Directed at Plaintiff who is a Minnesota resident.**

The Tippin Defendants are simply incorrect when they argue that Plaintiff fails to demonstrate any contacts between the Tippin Defendants and Minnesota. Sufficient minimum contacts exist between the Tippin Defendants such that the exercise of jurisdiction is proper. Nothing about the exercise of jurisdiction here over the Tippin Defendants should offend any notion of fair play and substantial justice.

**1. The Tippin Defendants satisfy the Five-Factor Test for Minimum Contacts.**

**a. The nature and quality of the contacts with the forum state.**

The Tippin Defendants took upon the representation of Alfred who was involved in a Minnesota state court action that reached international exposure. Certainly, the Tippin Defendants desired to become part of the action so much so that they filed unsupported filings

against a Minnesota resident without engaging in due diligence as to the veracity of the claims. Allegedly, the Tippin Defendants along with their Co-Defendant cohorts disengaged proper legal etiquette and filed knowingly false or reckless court filings. While they argue they did so in Missouri, the damage and intent were to effect Plaintiff's ability to practice law (based on the allegations) and seek damages from a Minnesota resident.

The Tippin Defendants co-counseled with the WWB Defendants to further pursue legal action against Plaintiff, a Minnesota resident. Their alleged client's (Alfred) claims pursued by the Tippin and WWB Defendants arise out of the alleged breach of improper legal services by Plaintiff as it pertained to the state action of the Prince estate. The notion that the Tippin Defendants filed the frivolous complaint against Plaintiff in Missouri fails to support the notion that they can avoid the nature and quality of contacts.

While the Tippin Defendants make much "hay" about not having the nature and quality of contacts with Minnesota, the Complaint filed in Missouri raises legal issues that pertain to Minnesota causes of action. For instance, Section VI of the Alfred Complaint states:

> VI.
>
> APPLICATION FOR WAIVER OR MODIFICATION OF EXPERT REVIEW
>
> 17. Under Minnesota law, M.S.A § 544.42(2), to establish a prima facie case for malpractice against an attorney, expert testimony must be given. However, under § 544.42(3), the expert affidavit may be waived or modified for good cause, which includes the need for discovery in order to determine whether the applicable standard of care has been met. Upon a showing of good cause, the expert affidavit can be modified or waived and the action may proceed.
>
> 18. Plaintiff seeks a waiver or modification of the affidavit of expert opinion and/or certification of expert review under § 544.42(3)(a)(3) in order to pursue discovery regarding the financial and other records, related to Mr. Bruntjen's representation and duties of loyalty and care with respect to the alleged loan described above.
>
> 19. Discovery will allow an expert to provide an opinion pursuant to § 544.42.

Here, the Tippin Defendants in effort to pursue their claims against Plaintiff contemplated seeking legal opinion from a licensed attorney in Minnesota. To do so, they must retain and contract with individuals in Minnesota that related substantially to the claims against Plaintiff. Moreover, Plaintiff never had the opportunity to argue that the allegations raised against Plaintiff were properly venued in Minnesota. Regardless, the Tippin Defendants sooner or later unquestionably knew that they would eventually purposely avail themselves of the privilege of conducting business in Minnesota and such that they should have reasonably anticipated being hauled into court in Minnesota. More pointedly, the Tippin Defendants sidestep the reality that they would have needed to take the deposition of Plaintiff in Minnesota. Additionally, the Jackson complaint even seeks property (the Alfred File) located in Minnesota as their claimed relief.

Indeed, the Alfred Complaint drafted by the Tippin Defendants address allegations of the attorney-client relationship between Plaintiff and Alfred that is substantially connected to the Minnesota state litigation involving the Prince Estate. This is underscored by the Alfred Complaint that begins:

> "The bedrock of the American legal system, is premised on a simple concept: the attorney must be loyal and trustworthy, putting the client's interests above his own at all times. The case at bar represents the antithesis of that important American ideal. Alfred Jackson, an heir to the Estate of Prince Rogers Nelson, engaged Defendant Attorney Justin Bruntjen to represent him in connection with a certain $2 million loan intended to bridge Mr. Jackson's financial needs until a distribution of his interests in the Estate occurs. Despite his ethical and contractual obligations to deliver those funds to his Mr. Jackson, upon information and belief, Mr. Bruntjen appropriated $500,000 for his own or other unauthorized use, depriving Mr. Jackson of both the use and enjoyment of the funds. Now, Mr. Bruntjen refuses to account for the money, and refuses to provide client files and records to Mr. Jackson's Case current counsel or Mr. Jackson despite demands that he immediately turnover the items and records. This suit seeks to recover those funds and files."

The fees sought by the attorneys involve submitting their claims to the Minnesota estate

and seeking approval from the Minnesota Court. In the WWB fee petition, the invoice addresses the alleged improper loan in their submittal for payment for the Prince estate. See Complaint, Exhibit 19. This further ties the alleged infamous loan to Minnesota. WWB involved the Tippin Defendants to file in Missouri even though the essence of the claims involving the legal malpractice action arise in Minnesota. When you unravel the essence of Tippin Defendants' involvement, the fibrous contact originates in Minnesota.

Finally, the Tippin Defendants were not authorized by Jackson to pursue claims in Missouri which means they did not have proper standing. As such, the Tippin Defendants cannot utilize Jackson's Missouri residence to shield them from Minnesota jurisdiction. Indeed, the Tippin Defendants were not under an attorney-client engagement with Jackson; therefore, the Tippin Defendants cannot seek protection. There is no question that the Missouri court had no jurisdiction of the fabricated complaint rendering non-existent the Court's authority to consider claims against Plaintiff in the first place. Put more plainly, if a party lacks standing, a district court has no subject matter jurisdiction. If the Court has not subject matter jurisdiction, then this Court were the nucleus of the action arises is involved.

A motion to dismiss for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1), may challenge the plaintiff's complaint either on its face or on the factual truthfulness of its averments. *See Titus v. Sullivan,* 4 F.3d 590, 593 (8th Cir.1993); *see also Osborn v. United States,* 918 F.2d 724, 729 n. 6 (8th Cir.1990). In a facial challenge to jurisdiction, such as the one before this Court, review is restricted to the pleadings and affords the non-moving party the same protections that it would receive under a Rule 12(b)(6) motion to dismiss. *See Osborn,* 918 F.2d at 729 n. 6. The court presumes that all the factual allegations in the complaint concerning jurisdiction are true and will not dismiss the claims unless the plaintiff fails to allege an essential

element for subject matter jurisdiction. *See Titus,* 4 F.3d at 593 (citing *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 731–32 (11th Cir.1982)); *Osborn,* 918 F.2d at 729 n. 6.

**b. The quality of contacts with the forum state.**

To maintain personal jurisdiction, the Tippin Defendants' contact with Minnesota is more than random, fortuitous, or attenuated. The Tippin Defendants role in the group of Defendants was to bring suit in Missouri. The fact that the Tippin Defendants who are sophisticated attorneys naturally anticipated that suing someone in Minnesota under Minnesota theories of law would eventually avail them to the borders of Minnesota.

Even further, the entire connection to Minnesota and the underlying allegations in Plaintiffs' complaint arise from the engagement of Alfred by Plaintiff under Minnesota jurisdictional connection. The Tippin Defendants cannot avoid their connection to Minnesota nor their connection to the WWB Defendants who hired the Tippin Defendants to pursue alleged claims that arose in Minnesota.

Humorously, the Tippin Defendants while vocalizing their disdain for Minnesota presence availed themselves to the jurisdiction by filing pro hac vice documents.

**c. The relation of the cause of action to these contacts.**

With respect to the relation of the cause of action to these contacts, the Tippin Defendants and the Prince Estate litigation are intertwined. The Tippin Defendants who are connected to the WWB Defendants who filed pro hac vice appearances in the Prince Litigation proclaiming to represent Jackson is the bond that connects the entire group to Minnesota.

**d. The interest of the forum state in providing a forum for its residents.**

The Tippin Defendants argue that the Alfred complaint did not allege a violation of Minnesota law is a blatant misrepresentation. See Alfred Complaint. The Alfred Complaint

goes into detail about facts and events occurring in Minnesota to sustain their claims in the Complaint. Indeed, the Alfred Complaint raises Minnesota violations of law including Minnesota legal malpractice claims and seeks property that is in Minnesota.

While the Tippin Defendants knowingly falsify facts to this court regarding their connection to Minnesota, the Tippin Defendants cannot disengage their contact to Minnesota are more evolved than expected. WWB Defendant acting as co-counsel made numerous contacts to Plaintiff.

**e. The Convenience of the Parties.**

The Convenience of the party's standard supports a finding of jurisdiction. Most of the witnesses including those individuals involved in the Prince Estate Litigation, the James Selmer Law firm who acted as local counsel, the Estate Attorneys, the Carver County Filings, and other documents are all located in Minnesota.

4. **The Tippin Defendants (and WWB Defendants) Have Sufficient Minimum Contacts Purposefully Directed at Minnesota**.

The Tippin Defendants motions (and WWD Defendants motion) to dismiss ignore established Minnesota law recognizing that participation in a conspiracy can create jurisdiction even if the defendant is never physically in the state as part of the conspiracy. *Personalized Brokerage Services, LLC v. Lucius*, Civ. No. 05-1663, 2006 WL 2088781, at *5 (D. Minn.2006).

Specifically, with respect to Minnesota, the Complaint plainly alleges the Tippin Contacts (the WWB Defendants) with Minnesota through their dealings with the involvement of the Prince litigation. In addition, the Tippin Defendants (and WWB individually and as a group) had frequent telephone calls and e-mail exchanges with the Co-Defendants and others regarding conspiring to be Alfred's counsel and to extort Plaintiff into paying money they knew or should have known was not owed to Alfred. While a phone call and or communication like a letter, fax

or email to Minnesota alone may not be enough to create jurisdictions, court "look at the totality of the circumstances" and consider the defendant's contacts with the forum in the aggregate, not individually. *Northrup King Co.,* 51 F.3d at 1388 (citing *Grand Entertainment Group v. Star Media Sales*, 988 F.2d 476, 482 (3rd Cir. 1993) ("Mail and telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction.")).

Here, the totality of the circumstances show that the Tippin Defendants (and the WWB Defendants) had substantial contacts with Minnesota as their prize was to get paid by Alfred's windfall from the Prince litigation and also the trustee for the Prince Estate. These actions were not random, fortuitous or isolated contacts with Minnesota. Rather, they were calculated efforts to be a part of something larger in their scheme, something very Minnesotan, something purple, and something Prince related. The Tippin Defendants (nor WWB Defendants) can escape this relevant fact.

Even further, the conspiracy claim raises its own unique application for jurisdiction. First, as a matter of substantive law, a conspirator who performs an act in furtherance of the conspiracy does so as an agent for his co-conspirators. Simply put, co-conspirators are each other's agents for purposes of liability and the act in the forum state may establish jurisdiction, they need only allege contacts sufficient for one defendant to obtain jurisdiction over all co-conspirators. An Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis*, 52 Fordham L. Rev. 234, 235 (1983). The Minnesota Supreme Court has interpreted Minnesota's long-arm statute to authorize conspiracy-based personal jurisdiction. *Hunt v. Nevada State Bank,* 172 N.W.2d 292, 311 (Minn. 1969). There, the court explained:

Once participation in a tortious conspiracy---the effect of which is felt in this state---is

sufficiently established, actual physical presence of each of the alleged conspirators is not essential to a valid assertion of jurisdiction. This construction of our long-arm statute follows from the premise that the legislature intended the statute to reach as far as constitutional limitations would permit. Id.

Here, a reasonable fact-finder could conclude from the allegations in the Complaint, the record's evidence submitted as exhibits to that complaint, and the absence of meaningful resistance to the notion that the Defendants were not authorized attorneys for Alfred, that the existence of conspiracy-based personal jurisdiction over the Defendants is appropriate. Plaintiff has further pled a civil conspiracy under Minnesota law showing that Defendants agreed and combined to accomplish either an unlawful purpose or a lawful purpose through unlawful means. *Personalized Brokerage Servs*., 2006 WL 208781 at *5; see also *In re Mun. Stormwater Pond*,___F. Supp.3d____, No. 18-cv-3495 (JNE/KMM), 2019 WL 8014509, at *5 (D. Minn. Nov. 25, 2019). Because the central connection between the Plaintiff and Defendants arise out of the Prince litigation venued in Minnesota, the question of jurisdiction is easily determined in Plaintiff's favor as the construction of the long-arm statute's purpose is to reach as far as constitutional possible. Certainly, the Defendants had no qualms about filing the deceptive complaint against Plaintiff in Missouri and now take an incongruent position in their current jurisdictional arguments before this court.

**III. RULE 12 (b) (6) STANDARD.**

Defendants purport to bring a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6). Rule 12(b) provides that a party asserting a defense by motion, including a motion for failure to state a claim upon which relief can be granted, must assert such

a defense *before* pleading, if a responsive pleading is allowed. Fed.R.Civ.P. 12(b) (emphasis added).

The standard of review to be applied on a Rule 12(b)(6) motion is as follows:

> "When ruling on a motion to dismiss, the district court must accept the allegations contained in the complaint as true and all reasonable inferences from the complaint must be drawn in favor of the nonmoving party. A complaint shall not be dismissed for its failure to state a claim upon which relief can be granted unless it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of a claim entitling him to relief."

Nevertheless, dismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and deigned to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity. To avoid dismissal, a complaint must allege facts sufficient to state a claim as a matter of law and not merely legal conclusions. *Young v. City of St. Charles, Missouri,* 244 F.3d 623, 627 (8th Cir.2001)(internal citations omitted); *see also DuBois v. Ford Motor Credit Co.,*276 F.3d 1019, 1022 (8th Cir.2002) (finding that to avoid dismissal under Rule 12(b)(6), the "complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claims."). Consequently, to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ——, 127 S.Ct. 1955, 1974 (2007).

The Court may not consider materials "outside the pleadings" on a motion to dismiss. However, this does not mean that only the complaint itself may be reviewed. As the court noted in *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir.1999):

When considering a motion for judgment on the pleadings (or a motion to dismiss under Fed.R.Civ.P. 12(b)(6)), the court generally must ignore materials outside the pleadings, but

it may consider 'some materials that are part of the public record or do not contradict the complaint,' *Missouri ex rel. Nixon v. Coeur D'Alene Tribe,* 164 F.3d 1102, 1107 (8th Cir.), *cert. denied,* —— U.S. ——, No.98–1848, 1999 WL 319349 (U.S. June 24, 1999), as well as materials that are 'necessarily embraced by the pleadings.' *Piper Jaffray Cos. v. National Union Fire Ins. Co.,* 967 F.Supp. 1146, 1152 (D.Minn.1997). *See also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1357, at 199 (1990)(court may consider 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint').

Therefore, documents attached to the complaint may be reviewed on a motion to dismiss, since they are part of the pleading.

**A. DEFENDANTS ARGUMENT SEEKING THE PROTECTION OF ABSOLUTE PRIVLEDGE IS FLAWED.**

The Defendants collectively argue that if the court does have personal jurisdiction over them, then the Defendants argue that Plaintiff cannot sustain a claim against them solely because the Courts protect them from their reckless comments and frivolous allegations. However, Defendants ignore the fact that they were not retained by Alfred at the time the Complaint was filed. Even more, they seem to either be admitting or heading into the territory that the filed Complaint against Plaintiff was either intentionally false violated Rule 11 or was with reckless disregard for the truth. Eventually, the Defendants filed a Rule 41 (a)(1) motion to voluntarily dismiss the case. Unfortunately, the conspired plan to bring reputational harm to Plaintiff through national media was accomplished. To that end, the collective "esteemed" licensed attorneys never corrected the false narrative that continues to impact Plaintiff.

**1. Defendants Lack of Authority to Bring Claims Against Plaintiff Stales the Absolute Privilege Argument.**

Defendants run roughshod over the fact that they were not recognized by Alfred to submit briefs to the Court on his behalf. The green velvet curtain that Defendants create to hide their malfeasance cannot protect them from the defamation, conspiracy, and tortious interference & Abuse Process. Reasonably, the context of absolute privilege only recognizes a speaker's need in the litigation context to be protected. However, the Court is compelled to consider whether the speaker was without standing to speak. If not, should the court protect the knowingly illegitimate utterer? Of course not!

Specifically, the individual claiming absolute privilege bears the burden of proof. See *Rehn v. Fischley*, 557 N.W.2d 328, 333 (Minn. 1997). The Defendants fail to establish that their retention by Jackson was valid. Indeed, the Defendants did not have authority to speak on behalf of Jackson thus not acting in a judicial capacity. According to the law, statements, even if defamatory, may be protected by absolute privilege in a defamation lawsuit if the statement is (1) made by a judge, judicial officer, attorney, or witness; (2) made at a judicial or quasi-judicial proceeding; and (3) the statement at issue is relevant to the subject matter of the litigation. *Matthis*, 243 Minn. at 224, 67 N.W.3d at 417. This court will not apply absolute privilege unless the "administration of justice requires complete immunity from being called to account for language used." See *Bol v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997)("For absolute privilege to apply, the public interest served must be one of paramount importance, such that it is entitled to protection even at the expense of failing to compensate harm to the defamed person's reputation."). However, caselaw implicates the notion that absolute privilege is not entirely absolute.

In fact, 'Absolute immunity' in defamation matters presents a conflict between two American principles equally regarded in the law, i.e., the right of an individual on one hand to

enjoy his reputation unimpaired by defamation attacks, and on the other hand the necessity in the public interest of a free and full disclosure of facts in the conduct of the legislative, executive and judicial departments of government. The WWB Defendants cite *Mahoney & Hagberg v. Newgard*, 729 N.W.2d 302 (Minn. 2007) as an argument in favor of applying absolute privilege to the current case. However, *Mahoney* specifically states, “Before applying absolute privilege, we look to see if there are competing policy interests that would counsel against application of the privilege. Id. at 309.

In this case, the public interest of having attorneys file lawsuits containing frivolous and defamatory per se statements against individuals on behalf of clients that those attorneys don’t even represent drastically outweigh the public interest of applying absolute privilege. *Mahoney* goes on, "the applicability of absolute privilege is limited." This court will not apply absolute privilege unless "the administration of justice requires complete immunity from being called to account for language used.” Citing *Mathis*, 243 Minn. at 223, 67 N.W.2d at 417. See also *Bol v. Cole*, 561 N.W.2d 143, 149 (Minn.1997) ("For absolute privilege to apply, the public interest served must be one of paramount importance, such that it is entitled to protection even at the expense of failing to compensate harm to the defamed person's reputation.”). Id. Clearly, justice is not administered by letting rogue attorneys file frivolous lawsuits on behalf of clients they don’t even represent.

If found to exist and the court determines the privilege is absolute, the action must be dismissed, and if found to be qualified or conditional, then the question of fact relating to plaintiff's proof of malice is usually for the jury under the usual rules of evidence.’ *Mills v. Denny*, supra, p. 224-225 of 63 N.W.2d. See *Robinson v. Home Fire & Marine Ins. Co.*, 244

Iowa 1084, 59 N.W.2d 776, 781-784 (1953), and *Aalfs v. Aalfs*, 246 Iowa 158, 66 N.W.2d 121, 123 (1954).

Similarly, the Defendants prior to retaining Alfred used defamatory comments to scare Alfred to terminate representation with Plaintiff. This was prior to their engagement with Alfred. Defendants continued to utilize the defamatory in effort to extort an improper legal malpractice claim against Plaintiff. Here, the Defendants were not counsel for Alfred as he terminated their relationship at the time of filing. Thus, Plaintiff's ability to prove malice to a jury against these Defendants is a logically conclusion.

**2. Tortious Interference and Abuse of Process Claims Are Proper Because the Underlying Tort is Available.**

Plaintiff's claims for tortious interference and abuse of process against the Defendants arise not only out of the malicious, reckless, and knowingly false statements but also actions taken by WWB Defendants including telling Alfred that he would not be responsible for their legal fees. These claims involve actions that are separate from Defendants the Alfred complaint against Plaintiff and have separate related damages. The tortious interference claims also arise out of Defendants illegally interjecting themselves into the solid representation that Alfred was receiving from Plaintiff and not the argued "absolute privileged" Alfred Complaint.

In support of their argument to dismiss Count 4 and 5 of the Complaint the tortious interference claims WWB Defendants argue that "absolute privilege bars claims sounding in defamation." Defendant WWB's Motion. Pg. 22. Their argument is primarily based on two cases *Mahoney*, and *Pinto v. International Set Inc*., 650 F.Supp. 306, (D. Minn. 1986). This argument is misguided in that in both those cases the claims that were found to be "sounding in defamation" were specifically to the contents in the document that was found to fall under absolute immunity. In this case, WWB Defendants argue that document would be the Alfred

Complaint filed against Plaintiff. Contrary to that idea is that Claims 4 and 5 in Plaintiff's complaint have nothing to do with anything WWB Defendants are even claiming was absolute privilege. The interference claims in this case occurred before Alfred even hired WWB on November 2, 2018. This is just another example of Defendants claiming absolute privilege to situations where they aren't even representing a client.

Here, Defendants argue that the absolute privilege doctrine also warrants dismissal on the tortious interference and abuse of process claims.

3. **Conspiracy Claims.**

Defendants do nothing to dispute the conspiracy claims other than that they are entangled with the defamation action. And as such, the conspiracy claims only fail if the Defendant's are successful on the Rule 12 (b)(2) dismissal. Otherwise, conspiracy claims survive.

## **CONCLUSION**

Based on the foregoing, Defendants have not me their burden that they are not subject to personal jurisdiction in Minnesota. Frankly, the collective actions from the first day has been deeply rooted in Minnesota no matter how much rhetoric is used to deny it. Accordingly, Defendants' Rule 12 (B) (2) motions are properly denied.

Similarly, Defendants move the court to dismiss the entire action based on Rule 12 (B)(6) because their improper conduct is somehow absolved by absolute privilege without limitation. However, Defendants were not counsel to Jackson upon filing the defamatory complaint thus not having standing to be in court. Ultimately, the conspired plan to shake Plaintiff down for money became unraveled leaving the Defendants to voluntarily dismiss the Janus-faced Complaint. The Defendants cannot seek protection from the Court when they were not legitimately in court. This Court can review exhibits attached to the Complaint to assist in the finding that Defendants'

argument for absolute privilege is easily disengaged from the purpose of the doctrine. As such, Defendants' request for dismissal based upon Rule 12 (B)(6) is properly denied.

Dated: October 28, 2020.

**ELEFTERAKIS, ELEFTERAKIS, & PANEK**

*/s/ Lee A. Hutton, III*______________
Lee A. Hutton, III (#0327992)
50 South Sixth Street
Suite 1390
Minneapolis, Minnesota 55402
(612) 805-4619
(612) 540-0075
lhutton@eeplaw.com
lhutton@elefterakislaw.com

***ATTORNEYS FOR PLAINTIFF***