UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Justin Andrew Bruntjen, Esq.

      Plaintiff,

v.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 20-cv-1832 (MJD/KMM)

Raffles Van Exel; White Wiggins
& Barnes, LLP; Ward Allen White IV,
Kennedy Lowell Barnes; James
W. Tippin & Associates; and
Keith Anthony Cutler,

      Defendants.

---

Lee A. Hutton, III, Elefterakis, Elefterakis & Panek, Counsel for Plaintiff.

Christopher Proczko and Robin M. Wolpert, Sapientia Law Group, PLLC, and Keith A. Cutler, Counsel for Defendants James W. Tippin & Associates and Keith Anthony Cutler.

M. Gregory Simpson and Laura E. Kuipers, Counsel for Defendants White, Wiggins & Barnes, LLP, Ward Allen White IV and Kennedy Lowell Barnes.

---

This matter is before the Court on the motion of Defendants James W.

Tippin & Associates and Keith Anthony Cutler (collectively "Tippin") to dismiss

[Doc. No. 9] and the motion of Defendants White, Wiggins & Barnes, LLP, Ward

Allen White IV and Kennedy Lowell Barnes (collectively "WWB") to dismiss [Doc. No. 19].

I.     **Summary**

The music artist Prince died in 2016.  Because he did not leave a will, his estate has been engaged in a years long battle to divide his assets.  The case before this Court is an offshoot of that litigation, and it involves the strange story of how one of Prince's heirs was allegedly taken advantage of by a group of people.  One of these individuals, Raffles van Exel, has also been connected to the deaths of other famous music celebrities, Whitney Houston and Michael Jackson.  As alleged in this case, Raffles befriended one of Prince's half-siblings, Alfred Jackson, after it became known that Jackson would inherit a share of Prince's Estate.  Unfortunately, Alfred Jackson has passed away, and after his death, a will was uncovered which purports to assign all of Alfred Jackson's estate - which is estimated to be worth tens of millions of dollars – to Raffles.

But this case actually involves one of Alfred Jackson's attorneys, and how the same group of people allegedly went to great lengths to interfere in that attorney-client relationship in order to get closer to Alfred Jackson – and his inheritance.

Currently before the Court are motions to dismiss from those defendants that are attorneys alleged to have been part Raffle's alleged plan to take advantage of Alfred Jackson and to get Plaintiff fired as Jackson's attorney. For the reasons discussed below, the Court will grant Tippin's motion, as those defendants merely served as local counsel for WWB, but will deny the motion of WWB, as the allegations in the Complaint sufficiently demonstrate that this Court has jurisdiction over WWB and that fact questions prevent the application of immunity from suit.

## II.     Factual Allegations

Plaintiff is a licensed attorney in Minnesota, who became legal counsel to Alfred Jackson, the half-brother of Prince, who died intestate in April 2016. In his complaint, Plaintiff alleges that Jackson was approached by Defendant Raffles van Exel ("Raffles"). (Comp. ¶ 11.) Plaintiff alleges that Raffles has claimed to have "guided" many celebrities, including Quinton Aaron from the film "The Blind Side," Peter Lamas of Lamas Beauty, Michael Jackson, Whitney Houston, Patti LaBelle, Lance Bass, Flavor Flav, George Benson and the late Ray Charles. (Id. ¶ 12.) Plaintiff further alleges that Raffles has a "colored history" involving some of these celebrities. For example, Raffles was in the hotel room

at, or shortly after, Whitney Houston was found dead and he allegedly removed

evidence from the room prior to the police arriving, and that he provided her

cocaine shortly before her death.  (Id. ¶¶ 14 and 15.)

Plaintiff alleges that immediately following Prince's death, Raffles called

Jackson's brother, Bruce Jackson, and told him to take Jackson out of the long-

term care facility he was living at in Waite Park, Minnesota.  (Id. ¶ 29.)  Raffles

then flew to Minneapolis and met with Alfred Jackson and his brother Bruce.

(Id. ¶ 30.)  Raffles claimed that he had previously worked for Prince and

convinced Jackson to sign a "Letter of Agreement" by which Raffles would be

paid ten percent by Jackson.  (Id. ¶ 31, Ex. 1.)  Raffles then introduced Jackson to

Frank Wheaton, who is a friend and attorney of Raffles.  (Id. ¶ 32.)  Thereafter,

Jackson retained Wheaton to represent him in Prince's probate matter.  (Id. ¶

33.).  Plaintiff alleges that Jackson then engaged Plaintiff in late April 2016 to

serve as local counsel under the direction of Wheaton.  (Id. ¶ 33[1].)

Plaintiff alleges that for months, Raffles ran a "con" on Jackson, trying to

find ways to benefit from his status as an heir to Prince's estate.  (Id. ¶ 35.)  For

example, he gained access to awards shows by attending with Jackson, and acted

---

[1] There are two paragraphs marked 33 in the Complaint.

as his gopher, to further ingratiate himself.  (<u>Id.</u>)  Then, in late December 2016 or early January 2017, Raffles brought Jackson to a Wells Fargo bank in Minneapolis and had Jackson open an account in both Raffle's and Jackson's name.  (<u>Id.</u> ¶ 36.) Jackson immediately told his brother Bruce about the account, and Jackson and his family ceased communicating with Raffles thereafter.  (<u>Id.</u> ¶ 37.)  In March 2017, Wheaton was terminated as Jackson's attorney, and Plaintiff assumed the role as primary counsel.  (<u>Id.</u>¶ 39.)

Plaintiff alleges that in the beginning of 2018, Jackson again began having contact with Raffles.  (<u>Id.</u> ¶ 40.)  In August 2018, Raffles began a campaign to get Plaintiff fired as Jackson's attorney, telling him that Plaintiff was racist and that he didn't like Black people.  (<u>Id.</u> ¶ 43.)  He sent Jackson's brother Bruce a copy of a document entitled "termination of employment and representation" and instructed him to have Jackson sign it and then send it back to Raffles and others. (<u>Id.</u> ¶ 47.)  Raffles also engaged WWB to get Plaintiff fired.  (<u>Id.</u> ¶¶ 50, 51.)  On November 2, 2018, Plaintiff was replaced as counsel for Jackson by WWB.  (<u>Id.</u> ¶ 54.)

Plaintiff alleges that on December 6, 2018, he received an email from WWB requesting Jackson's files.  (<u>Id.</u> ¶ 60.)  At some point, Plaintiff learned that

Jackson had terminated WWB's representation on December 2, 2018. (Id. ¶ 62.) On December 14, 2018, Plaintiff received a call from Michael Lythcott, an agent who had worked with Jackson to obtain a loan from Primary Wave. (Id. ¶¶ 55 and 63.) Lythcott stated that he was with Bruce, Jackson and Raffles at Jackson's home in Missouri, and that they had been told by Ward White at WWB that Plaintiff had stolen $500,000 from Jackson in December 2017. (Id. ¶ 63.) White allegedly told Jackson, Lythcott and Bruce Jackson that he and Kennedy Barnes of WWB had spent hours at the bank with Jackson and that there was no record of Jackson receiving any money from Plaintiff in December 2017. (Id. ¶ 64.) Plaintiff immediately sent Lythcott a copy of the wire confirmation that $450,000 (less $50,000 for Plaintiff's fees) had been wired to Jackson's account. (Id. ¶ 65.) White and Barnes continued to insist that Jackson never received the money. (Id. ¶ 66.)

On December 21, 2018, Plaintiff received an email from Barnes with a letter attached stating that Plaintiff had deducted $100,000 from a disbursement without authority and again asked for Jackson's file. (Id. ¶ 68.) Plaintiff responded that the allegations were fabricated and had no basis in fact and demanded that WWB stop spreading falsities about him and informed them he

believed their comments were defamatory and easily proven false.  (Id. ¶ 69.)

Plaintiff further stated he was aware that WWB had been terminated and that

before he would provide WWB any documents, he needed written authorization

from Jackson.  (Id.)

On January 31, 2019, Plaintiff received an email from Barnes with a

complaint attached, accusing him of stealing $500,000 from Jackson.  (Id. ¶ 70.)

The complaint was filed by Barnes and Keith Cutler, of the Missouri law firm of

James W. Tippin and Associates, in the United States District Court, Western

District of Missouri.  (Id.)   Plaintiff alleges that a simple review of Jackson's bank

statements would have shown the allegations were false.  (Id. ¶ 75.)

On February 1, 2019, Plaintiff received an email from Ryan Naumann, a

producer at TheBlast.com, an online media source, asking for a comment

regarding the missing $500,000.  (Id. ¶ 77.)  Plaintiff called Barnes, telling him of

this contact, and demanded that he dismiss the complaint.  (Id. ¶ 76.)  On

February 5, 2019, the lawsuit was dismissed.  (Id. ¶ 80.)  The next day, February

6, 2019, TheBlast.com published an article that was based on the allegation that

Plaintiff stole $500,000 from Jackson.  (Id. ¶ 81.)  The article was picked up by

additional media outlets.  (Id. ¶ 83.)

On February 12, 2019, Jackson hired the law firm of Chestnut Cambronne PA ("Chestnut") to represent his interests in the Prince Estate.  (Id. ¶ 84.)  On that date, Chestnut filed a Notice of Termination signed by Jackson, stating that WWB had been terminated on December 8, 2018.  (Id. ¶ 85.)  The next day, Chestnut filed an affidavit from Jackson, in which he stated that he had terminated WWB on December 2, 2018 by sending him a notice through the U.S. Mail.  (Id. ¶ 86.)  Following the filing of this affidavit, WWB ceased filing documents and taking action on behalf of Jackson.  (Id. ¶ 87.)

In late March or early April 2019, Raffles had a Florida attorney, Leonardo Da Vinci Starke, fly to Kansas City to meet with Jackson.  (Id. ¶ 88.)  Jackson allegedly hired Starke while he was still represented by Chestnut.  (Id. ¶ 92.) Starke never contacted Chestnut or the Special Administrator for the Prince Estate in regard to his representation.  (Id. ¶ 93.)

Plaintiff alleges that upon information and belief, Jackson's fair market value in his share of the Prince Estate was valued at $50,000,000 or more.  (Id. ¶ 96.)  Raffles, working with Primary Wave and Starke, began an effort to get Jackson to sell his portion of the Prince Estate to Primary Wave for a steeply discounted price.  (Id. ¶ 97.)  In August 2019, Raffles and Starke got Jackson to

enter into a short-form transfer agreement with Primary Wave in which Jackson

sold 90% of his interest in the Prince Estate for $15,000,000.  (Id. ¶ 99.)  Upon

information and belief, Raffles was to receive $300,000 for completed transfer of

Jackson's interest in the Prince Estate to Primary Wave.  (Id. ¶ 99.)

Plaintiff alleges that Raffles continued to scheme against Jackson.  (Id. ¶¶

100 to 104.)  In the middle of August 2019, Jackson and Raffles had a falling out

and Jackson kicked Raffles out of his house.  (Id. ¶ 105.)  On August 27, 2019,

Raffles and Starke met in Kansas City, and the next day, they went to Jackson's

home during which time Starke had Jackson sign a long-term agreement of the

transfer of Jackson's interest in the Prince Estate, and that either that same night

or the next morning, Jackson passed away.  (Id. ¶¶ 111 and 113.)

Plaintiff alleges that Raffles knew that Jackson had executed a will on

October 7, 2016, and that Raffles was not a beneficiary of that will.  (Id. ¶¶ 115-

116.)  In July 2019, Raffles had Starke draft a new will for Jackson naming Raffles

as the sole beneficiary.  (Id. ¶ 117.)  On November 13, 2019, Starke filed the new

will.  (Id. ¶ 110.)

On July 16, 2020, WWB submitted a claim against Jackson's estate for

$177,176.32, and that none of the billings related to the Missouri lawsuit allegedly

filed on Jackson's behalf against Plaintiff.  (Id. ¶¶ 120, 121.)  Plaintiff further

alleges that this billing directly contradicts what WWB told Jackson – that WWB

would only submit invoices for legal fees to the administrator of the Prince

Estate.  (Id. ¶ 122, Ex. 2.)

In his Complaint, Plaintiff asserts a number of claims against the

defendants:  Count 1, Defamation Per Se against Raffles; Count 2, Defamation

Per Se against the WWB; Count 3, Defamation Per Se against WWB and Tippin;

Count 4, Tortious Interference with Contract against Raffles and WWB; Count 5,

Tortious Interference with Prospective Economic Advantage against Raffles and

WWB; Count 6, Civil Conspiracy to Tortiously Interfere with Contract against

Raffles and WWB; Count 7, Civil Conspiracy to Defame against Raffles and

WWB; Count 8, Civil Conspiracy to Defame against WWB and Tippin; and

Count 9, Abuse of Process against WWB and Tippin.

## III.   Standard to Determine Personal Jurisdiction

Federal courts use a two-step inquiry when determining whether it has

personal jurisdiction over a non-resident party: "(1) whether the facts presented

satisfy the forum state's long-arm statute, and (2) whether the non-resident has

minimum contacts with the forum state, so that the court's exercise of

jurisdiction would be fair and in accordance with due process." <u>Soo Line R. Co.</u>

<u>v. Hawker Siddeley Canada, Inc.</u>, 950 F.2d 526, 528 (8th Cir. 1991) (citation

omitted).  The inquiry collapses into a single question of whether the exercise of

personal jurisdiction comports with due process, when a state construes its long-

arm statute to confer jurisdiction to the fullest extent permitted by the due

process clause.  <u>Bell Paper Box, Inc. v. U.S. Kinds, Inc.</u>, 22 F.3d 816, 818 (8th Cir.

1994).  Minnesota has construed its long-arm statute to have the maximum

extraterritorial effect allowed under the due process clause.  <u>Valspar Corp. v.</u>

<u>Lukken Color Corp.</u>, 495 N.W.2d 408, 410-411 (Minn. 1992).

The due process clause requires that there be "minimum contacts"

between the defendant and the forum state before the forum state may exercise

jurisdiction over the defendant.  <u>World-Wide Volkswagen Corp. v. Woodson</u>,

444 U.S. 286, 291 (1980).  The "minimum contacts" requirement will be satisfied if

the defendant's conduct and connection with the forum state is such that the

defendant should reasonably anticipate being haled into the forum state's court.

<u>Id.</u>, at 297.  "The inquiry is whether the non-resident defendant 'has

"purposefully directed" his activities at residents of the forum ... and the

litigation results from alleged injuries that "arise out of or relate to" those

activities.'" Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A., 51 F.3d 1383, 1387 (8th Cir. 1995) (citing Burger King Corp. v. Rudzewicz,, 471 U.S. 462, 472 (1985)).

The burden is on Plaintiff to prove the minimum contacts necessary to satisfy due process. Hardrives, Inc. v. City of LaCrosse, Wisconsin, 240 N.W.2d 814, 816 (Minn. 1976). See also, Newhard, Cook & Co. v. Inspired Life Centers, Inc., 895 F.2d 1226, 1228 (8th Cir. 1990). "At the pre-trial stage, however, the plaintiff need only make a prima facie showing of sufficient Minnesota-related activities through the complaint and supporting evidence, which will be taken as true." Hardrives, 240 N.W.2d at 816. In addition, the facts must be viewed in the light most favorable to plaintiff and all factual conflicts must be resolved in the plaintiff's favor. Digi-Tel Holdings, Inc. v. Proteq Telecommunications, Ltd., 89 F.3d 519, 522 (8th Cir. 1996).

There are two types of personal jurisdiction: general and specific. Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Count, 137 S.Ct. 1773, 1780 (2017).

> For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home. A court with general jurisdiction may hear *any* claim against that

defendant, even if all the incidents underlying the claim occurred in a different State.  But "only a limited set of affiliations with a forum will render a defendant amenable to" general jurisdiction in that State.

Specific jurisdiction is very different.  In order for a state court to exercise specific jurisdiction, "the *suit* " must "aris[e] out of or relat[e] to the defendant's contacts with the *forum*."  In other words, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."  For this reason, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction."

Id. (internal citations omitted).

## A.    Five Factor Test

The Court should apply the following factors to determine whether

personal jurisdiction exists over an out-of-state defendant: 1) the nature and

quality of the contacts; 2) the quantity of the contacts; 3) the relationship of those

contacts with the cause of action; 4) the interest of the forum state; and 5) the

convenience of the parties.  Aly v. Hanzada for Import & Export Co., Ltd., 864

F.3d 844 (8th Cir. Mar. 23, 2017) reh'g and reh'g en banc denied (May 6, 2017).

## B.  Calder Effects Test

In Calder v. Jones, the Supreme Court held the court had personal

jurisdiction over an out-of-state defendant where the defendant's alleged

intentional and tortious conduct was aimed at the forum state.  465 U.S. 783, 789-90 (1984).

> [A] defendant's tortious acts can serve as a source of personal jurisdiction only where the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional; (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered – and which the defendant knew was likely to be suffered – [in the forum state].

Johnson v. Arden, 614 F.3d 785, 796 (8th Cir. 2010) (citations omitted).  The Eighth Circuit has held that the Calder test "allows the assertion of personal jurisdiction over non-resident defendants whose acts are performed for the very purpose of having their consequences felt in the forum state."  Id. (citations omitted).  The court further held that the Calder test is merely an additional factor to consider when evaluating a defendant's contact with the forum state.  Id. at 797.  "We therefore construe the Calder effects test narrowly, and hold that, absent additional contacts, mere effects in the forum state are insufficient to confer personal jurisdiction."  Id.

## IV.   Motions to Dismiss for Lack of Personal Jurisdiction

### A.   Whether Court has Personal Jurisdiction over Tippin

Tippin moves to dismiss the claims against them on the basis of lack of personal jurisdiction or in the alternative, for failure to state a claim for which relief can be granted.

### 1.    Nature and Quality of Contacts and Quantity of Contacts

As set forth above, Defendant Cutler was hired as local counsel by WWB in the lawsuit filed in the Western District of Missouri in which Plaintiff was accused of stealing money from Jackson.  The lawsuit was voluntarily dismissed five days after it was filed.

Cutler is a licensed attorney in the state of Missouri.  (Cutler Aff. ¶ 2.)  He has never been licensed to practice in Minnesota and did not visit Minnesota in connection with the Missouri lawsuit.  (Id. ¶¶ 3 and 5.)  He had no contact with Plaintiff regarding the lawsuit, and never wrote, emailed or otherwise corresponded with Plaintiff.  (Id. ¶¶ 9 and 10.)

Cutler is a partner in the Tippin firm, and his office is in Kansas City, Missouri.  (Id. ¶¶ 11 and 12.)  The firm does not advertise in Minnesota and does not employ any attorneys who were licensed in Minnesota.  (Id. ¶¶ 13 and 14.)  No one at the Tippin firm had any direct contact with Plaintiff.  (Id. ¶ 16.)

Tippin's role in the Missouri action was simply serving as local counsel to WWB.  (Id. ¶ 19.)  In that role, Tippin did not draft any pleadings, other than an Application for Admission *Pro Hac Vice*.  (Id. ¶ 22.)  Tippin did not investigate, supervise or verify the work of WWB.  (Id. ¶ 23.)  No one at Tippin contacted the media regarding the lawsuit.  (Id. ¶ 25.)  Accordingly, the Court finds these factors weigh against a finding of personal jurisdiction.

### 2. Relationship of the Cause of Action to Contacts with Forum State

This factor also weighs against a finding of personal jurisdiction over Tippin.  Given Tippin's minimal contacts with the State of Minnesota, general jurisdiction does not exist.  As to specific jurisdiction, the only actions allegedly taken by Tippin occurred in Missouri, not Minnesota.

### 3. Interest of the Forum State in Providing Forum for its Residents

The underlying lawsuit was filed in Missouri.  The loan which was the subject of the Missouri action was not made in Minnesota, Jackson was not a resident of Minnesota and the loan proceeds were not deposited in a bank in Minnesota.  The only connection to Minnesota is that Plaintiff is a resident of Minnesota.  That is not sufficient to satisfy due process.  See Lawhead v. Law

Offices of Joseph Martin Carasso, Civ. No. 20-250, 2020 WL 5106817, at * 4 (D.

Minn. Aug. 31, 2020) (citing Walden v. Fiore, 571 U.S. 277, 285 (2014) (minimum

contacts analysis looks to the defendant's contacts with the forum state, not the

defendant's contacts with persons who reside in the forum state)).  Accordingly,

the Court finds this factor weighs against a finding of personal jurisdiction over

Tippin.

### 4.  Calder Effects Test

The Court further finds that Plaintiff has failed to demonstrate that Tippin

took any action that was directed at Minnesota.  The only actions that Plaintiff

attributes to Tippin are statements made in pleadings in furtherance of litigation

in Missouri.  Statements made in another state, without more, are insufficient to

confer jurisdiction.  See Johnson, 614 F.3d at 796-97; Wood v. Kapustin, 992 F.

Supp.2d 942, 946 (D. Minn. 2014) (finding that disparaging comments about an

attorney online was insufficient to establish specific jurisdiction).  Here, other

than the alleged defamatory statements in the Missouri complaint, Plaintiff has

not alleged any other contacts between Tippin and Minnesota.

In a case with similar facts, Minnesota attorneys and residents brought suit

in Minnesota against a New York lawyer alleging damages from legal work done

by the defendant, in New York, concerning the estate of the plaintiffs' deceased

brother. Lawhead, 2020 WL 5106817, at * 2. The district court found that the

New York lawyer had a lack of contact with the State of Minnesota and

dismissed the action for lack of personal jurisdiction over the defendant. Id. at

*4. See also Austad Co. v. Pennie & Edmonds, 823 F.2d 223, 226-27 (8th Cir. 1987)

(affirming dismissal for lack of personal jurisdiction where the out-of-state law

firm did not have sufficient contacts with forum state to confer jurisdiction, as

the firm had no offices in forum state, did not practice there, and the actions

giving rise to the lawsuit took place in another forum).

Plaintiff asserts that Minnesota law recognizes that participation in a civil

conspiracy can create jurisdiction even if the defendant has never physically been

in the state as part of the conspiracy. Personalized Brokerage Services, LLC v.

Lucius, Civ. No. 05-1663, 2006 WL 208781, at * 5 (D. Minn. Jan. 26, 2006).

"Whether an alleged conspiracy can establish personal jurisdiction is a question

of state law." Id. (citation omitted). Minnesota has endorsed the conspiracy

theory of personal jurisdiction. Id. (citing Hunt v. Nev. State Bank, 285 Minn. 77,

172 N.W.2d 292, 311 (Minn. 1969)). "To establish personal jurisdiction based on a

conspiracy theory, [Plaintiff] must show "(1) the existence of a conspiracy; (2) the

nonresident's participation in or agreement to join the conspiracy; and (3) an

overt act taken in furtherance of the conspiracy within the forum's

boundaries."  (Id.) (citation omitted).  Minnesota law further provides:

> Our [long-arm] statute, however, does not require a finding that each
> defendant be physically present in this state at the time the conspiracy has
> its fruition.  Once participation in a tortious conspiracy-the effect of which
> is felt in this state-is sufficiently established, actual physical presence of
> each of the alleged conspirators is not essential to a valid assertion of
> jurisdiction.  This construction of our statute follows from the premise that
> the legislature intended the statute to reach as far as constitutional
> limitations would permit.

Hunt, 172 N.W.2d at 311.

Plaintiff asserts the Court should look to the totality of the circumstances

and consider the defendant's contacts with the forum state in the aggregate, not

individually.  Northup King Co., 51 F.3d at 1388.  Plaintiff argues that Tippin was

involved in a conspiracy to get Plaintiff fired by Jackson so that WWB and Tippin

could represent Jackson with regard to his interest in the Prince Estate, and to

extort money from Plaintiff that they knew or should have known was not owed

to Jackson.  Plaintiff further argues the totality of the circumstances show that

Tippin, together with WWB and Raffles, had substantial contacts with Minnesota

in their efforts to benefit from Jackson's windfall from the Prince litigation and

also the trustee for the Prince estate.  They were calculated efforts to be part of

something larger related to the Prince litigation, which was venued in Minnesota.

Relevant to this inquiry is the fact that Plaintiff only asserts a civil conspiracy claim to defame against Tippin – not the broader conspiracy of tortious interference with contract alleged against Raffles and WWB. (See Comp. ¶¶ 169-175.) There are no allegations in the Complaint which demonstrate that Tippin was involved with the alleged plan by Raffles and WWB to get Plaintiff fired as Jackson's attorney so that WWB could represent Jackson in the Prince Estate litigation and thereafter reap the benefits of Jackson's inheritance from the Prince Estate. Rather, the allegations in the Complaint only demonstrate that Tippin acted as local counsel for WWB in the Missouri action and was not otherwise involved in preparing the Missouri complaint or involved in the investigation of the claim that was the basis of the Missouri complaint. Accordingly, the Court finds that Plaintiff has failed to allege a conspiracy upon which this Court can find personal jurisdiction over Tippen.

Because Plaintiff has not demonstrated that Tippen has sufficient contacts with Minnesota for this Court to exercise personal jurisdiction over Tippen, the Court will grant Tippen's motion to dismiss.

D.     **Whether Court has Personal Jurisdiction over WWB**

WWB was a law firm that operated out of Dallas, Texas.  (Wiggins Decl. ¶

3.)  Its principle place of business was in Texas, but had offices in New York,

Nigeria and South Africa.  (Id.)   All four partners of WWB are residents of Texas.

(Id. ¶ 4.)  None are licensed to practice in Minnesota, nor do they maintain bank

accounts in Minnesota or own any assets or real property in Minnesota.  (Id. ¶ 5.)

WWB did not advertise in Minnesota or solicit business in Minnesota.  (Id. ¶ 7.)

Other than its representation of Jackson, WWB performed no legal work in

Minnesota and did not regularly represent Minnesota clients in Minnesota.  (Id.

¶ 8.)

On two occasions, Barnes traveled to Minnesota to represent Jackson in the

Prince litigation, and he was admitted to practice *pro hac vice* for that purpose.

(Barnes Decl. ¶ 11.)  Similarly, White traveled to Minnesota to represent Jackson

in the Prince litigation on one occasion.  (Id. ¶ 10.)  He was also admitted *pro hac*

*vice* and has not otherwise practiced law in Minnesota and does not have any

other contacts in Minnesota.  (Id. ¶ 7.)

These facts clearly demonstrate that the Court cannot exercise general

jurisdiction over WWB.  However, the claims against WWB differ substantially

from those against Tippin with respect to specific jurisdiction.  In addition to the

claims of defamation and conspiracy to defame, Plaintiff has asserted a claim of

civil conspiracy to tortiously interfere with contract against Raffles and WWB.

Plaintiff alleges that WWB conspired with Raffles to terminate the

representation agreement between Jackson and Plaintiff, and then replace

Plaintiff with WWB.  As part of the conspiracy, Plaintiff alleges that WWB

successfully convinced Jackson to terminate Plaintiff's representation based on

false information and that WWB and Raffles concocted a false narrative that

Plaintiff stole money from Jackson, and that Jackson needed to hire WWB to get

the money back.  WWB further told Jackson that Jackson would not be

responsible for its legal fees, because they would be paid by the Prince Estate.

The allegations in the Complaint as a whole show that Defendants had

substantial contacts with Minnesota because the "prize" was to get paid by

Jackson's windfall from the Prince Estate and from the trustee for the Prince

Estate.  They were calculated efforts to be part of something larger related to the

Prince litigation.

The Court finds that Plaintiff has sufficiently alleged a conspiracy and that

WWB was a part of this conspiracy, but to establish personal jurisdiction over

WWB, Plaintiff must further allege than an overt act taken in furtherance of the conspiracy took place within the forum's boundaries. <u>Personalized Brokerage Services, LLC</u>, 2006 WL 208781, at *5. Plaintiff need not allege that WWB committed this overt act as "actual physical presence of each of the alleged conspirators is not essential to a valid assertion of jurisdiction." <u>Hunt</u>, 172 N.W.2d at 311.

Plaintiff has alleged that the conspiracy began in April 2016, when one of its members, Raffles, traveled to Minnesota with Jackson's brother Bruce to remove Jackson from a long-term care facility in Waite Park, Minnesota, as Raffles saw Jackson as a potential "mark" to con. (Comp. ¶¶ 29 and 30.) Raffles then misrepresented his experience and qualifications in order to get Jackson to sign a "Letter Agreement" which provided Raffles would be paid ten percent by Jackson. (<u>Id.</u> ¶ 31.) Plaintiff has also alleged that around December 2016 or January 2017, Raffles flew to Minneapolis to get Jackson to open a bank account in both Jackson's and Raffle's name. (<u>Id.</u> ¶ 36.)

Based on these allegations, the Court finds that it has personal jurisdiction over WWB because the conspiracy to interfere with contract was aimed at

Minnesota and because an overt act in furtherance of the conspiracy took place in Minnesota.

**V.      Motion to Dismiss for Failure to State a Claim**

In the alternative, WWB argues that if the Court finds that it has personal jurisdiction over them, then dismissal is appropriate on the grounds that WWB has absolute immunity, as the basis for the claims are allegations contained in the Missouri complaint.  See Carpenter v. Extendicare Health Servs., No. 15-cv-120, 2015 WL 7725406, at * 6 (D. Minn. Oct. 26, 2015) ("The doctrine of absolute immunity protects a party from liability for statements, even if defamatory, if the statement is made by a judge, attorney or witness in a judicial or quasi-judicial proceeding, and the statement is relevant to the subject matter of the litigation. Where absolute privilege applies, the speaker is shielded from liability for even intentionally false or malicious statements.  The privilege is intended to encourage witness dialogue without fear of civil liability.").

WWB argues that Plaintiff's claims against them are barred by absolute privilege, even if the allegations in the Missouri complaint were untrue.  The same is true for the claims of civil conspiracy and abuse of process.  "[A] Minnesota plaintiff is not permitted to avoid defenses to a defamation claim by

challenging the defamatory statements under another doctrine . . . Here,

plaintiffs cannot avoid the qualified privilege defense [] by recharacterizing their

defamation claim as a claim for tortious interference or product disparagement."

Guzhagin v. State Farm Mut. Auto Ins. Co., 566 F. Supp. 2d 962, 969 (D. Minn.

2008).

Plaintiff responds that Defendants are not entitled to absolute immunity

because they were not retained by Jackson when the Missouri action was

commenced and thus did not have the authority to file the Missouri action on

Jackson's behalf.

As the party seeking immunity, Defendants have the burden of proving

that immunity applies. Rehn v. Fischley, 557 N.W.2d 328, 333 (Minn. 1997).

Courts should not apply absolute privilege unless "the administration of justice

requires complete immunity from being called to account for language used."

Bol v. Cole, 561 N.W.2d 143, 149 (Minn. 1997). Furthermore, Minnesota law

provides that before applying absolute privilege, the court must look to see if

there are competing policy interests that would counsel against application of the

privilege. Mahoney & Hageberg v. Newgard, 729 NW.2d 302, 309 (Minn. 2007).

Plaintiff argues the public interest of preventing attorneys from filing suit containing frivolous and defamatory per se statements against individuals, on behalf of an individual the attorney does not represent, outweighs the public interest of applying the absolute privilege. Plaintiff further argues that if the Court finds that an absolute privilege does not apply, but instead finds immunity to be qualified or conditional, then the question of fact relating to proof of malice is usually for the jury to decide. See Stuempges v. Parke, Davis & Co., 297 NW.2d 252, 257 (Minn. 1980) (finding that if defendant demonstrates the existence of a qualified privilege for a defamatory statement, the burden shifts to plaintiff to prove the privilege was abused, which is generally a question for the jury).

In reply to Plaintiff's assertion that WWB did not represent Jackson when the Missouri action was filed, WWB has submitted a supplemental declaration from Defendant Kennedy Barnes in which he states that WWB did receive an email from Jackson on December 2, 2018 with a "Termination of Employment and Representation." (Supp. Barnes Decl. ¶ 9.) Barnes states the email was suspicious as the firm had never received an email from Jackson before. (Id. ¶¶ 5 and 6.) Barnes and White then called Jackson to ask about the email. (Id. ¶ 6.)

During the call, Jackson assured them that he had not fired WWB and that he wanted WWB to continue to represent him.  (Id. ¶ 7.)  Jackson then invited Barnes and White to his home in Missouri.  (Id. ¶ 8.)  On December 5, 2018, Barnes and White met Jackson and Raffles at Jackson's home, and during that meeting, Jackson signed a rescission of the termination email.  (Id. Ex. A.)  Also, during that meeting, Barnes and White discussed with Jackson the fact that the repayment due dates were quickly approaching for the $2 million loan.  (Id. ¶ 10.)  At that time, Jackson informed them that he had never received the final installment of the loan.  (Id.)  Barnes asserts that after this conversation, WWB continued to represent Jackson.  (Id. ¶ 12.)  WWB was still representing Jackson when the Missouri action was filed on January 31, 2019, and when the stipulation for dismissal was filed on February 5, 2019.  (Id.)  WWB was not discharged until February 7, 2019, when it received a termination notice from Jackson's new counsel.  (Id. ¶ 14.)  Barnes asserts that the Chestnut firm's characterization that WWB was terminated as of December 2, 2018 is inaccurate.  (Id. ¶ 15.)

WWB asserts that the absolute privilege applies in this case as WWB did represent Jackson at the time the Missouri action was pending.  WWB asserts the statements made by Barnes and White, including the discussions leading up to

litigation and the allegations in the complaint are the exact type of statements

that the privilege is intended to address.  WWB was simply taking the necessary

steps to assist their client to get back his funds.  WWB did contact Plaintiff on

multiple occasions asking for Jackson's files and the information about the loan

disbursements and missing money.  The information they received from Plaintiff

and Lythcott was insufficient to locate the funds initially. (Barnes Decl. ¶¶ 16,

20.)  WWB asserts it did its due diligence, accompanying Jackson to his bank and

providing the bank staff the available information, but the bank was unable to

determine what happened to the missing funds.  (Id. ¶ 18.)  WWB asserts it

discussed the issue with Jackson and his advisors leading up to the lawsuit

trying to figure out what happened, and then WWB filed the Missouri complaint

with the assistance of local counsel based on the information and belief that was

available at the time.  It wasn't until after the complaint was filed that Plaintiff

sent the additional information needed to locate the funds.  (Id. ¶ 25.)  As soon as

they confirmed that Jackson had received the funds, WWB dismissed the

Missouri action.  (Id. ¶ 26.)

        Based on the record currently before the Court, there is clearly a fact

question as to whether WWB did in fact represent Jackson at the time they

became aware of an allegation that Plaintiff did not forward the last installment of the $ 2 million loan to Jackson and when the Missouri action was filed. As a result, WWB has failed to demonstrate it is entitled to absolute immunity. Furthermore, whether the evidence shows that WWB did not represent Jackson at the time the Missouri action was filed, and that Defendants knew that Plaintiff had demonstrated he sent Jackson the last installment prior to the Missouri action, are fact questions for a jury to decide. See Stuempges, 297 N.W.2d at 257.

Accordingly,


**IT IS HEREBY ORDERED**:

1.     Defendants James W. Tippin & Associates and Keith Anthony Cutler's Motion to Dismiss [Doc. No. 9] is **GRANTED**; and

2.     Defendants White, Wiggins & Barnes, LLP, Ward Allen White IV and Kennedy Lowell Barnes's Motion to Dismiss [Doc. No. 19] is **DENIED**.

Date:  December 11, 2020

                                        s/Michael J. Davis
                                        Michael J. Davis
                                        United States District Court